No. 2013-1137
(Reexamination No. 90/008,057)

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

———— ◆ ————

IN RE RONALD A. KATZ TECHNOLOGY LICENSING L.P.

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board

## APPELLANT'S OPENING BRIEF

LORI R. MASON
LOWELL D. MEAD
COOLEY LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
(650) 843-5000 (telephone)
(650) 857-0663 (facsimile)
lmason@cooley.com
lmead@cooley.com

FRANK V. PIETRANTONIO
JONATHAN G. GRAVES
COOLEY LLP
Reston Town Center
One Freedom Square
11951 Freedom Drive
Reston, VA 20190-5656
(703) 456-8000 (telephone)
(703) 456-8100 (facsimile)
fpietrantonio@cooley.com
jgraves@cooley.com

*Attorneys for Appellant*
*Ronald A. Katz Technology Licensing L.P.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## IN RE RONALD A. KATZ TECHNOLOGY LICENSING L.P.

### Appeal No. 2013-1137

### CERTIFICATE OF INTEREST

Counsel for the Katz Ronald A. Katz Technology Licensing, L.P. certifies the following:

1.     The full name of every party or amicus presented by me is:

Ronald A. Katz Technology Licensing, L.P.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4.     The following law firm and attorneys are expected to appear as counsel in this Court:

Cooley LLP:  Stephen C. Neal, Frank V. Pietrantonio, Jonathan G. Graves, Lori R. Mason, Lowell D. Mead

The following law firms and attorneys appeared in the Patent Office on behalf of Ronald A. Katz Technology Licensing, L.P.:

Cooley LLP:  Frank V. Pietrantonio

Berry & Associates:  Reena Kuyper

Date:  March 5, 2013                    /s/Frank V. Pietrantonio
                                        Frank V. Pietrantonio

i.

# TABLE OF CONTENTS

**Page**

I.  STATEMENT OF RELATED CASES ................................................. 1

II.  STATEMENT OF JURISDICTION ..................................................... 2

III.  STATEMENT OF THE ISSUES .......................................................... 3

IV.  STATEMENT OF THE CASE ............................................................. 4

V.  STATEMENT OF FACTS ...................................................................... 4

    A.  The Patented Technology Dates from the Mid-1980s. ............... 4

    B.  The Patented Technology Has Achieved Extensive Commercial Success and Patent Licensing................................. 7

    C.  Procedural History of the '285 Patent and Reexamination......... 8

    D.  Asserted Prior Art References.................................................. 10

VI.  SUMMARY OF THE ARGUMENT .................................................. 11

VII.  ARGUMENT ...................................................................................... 13

    A.  Standard of Review: Obviousness Must be Evaluated From the Time of the Claimed Invention, and Is Reviewed De Novo ................................................................................... 13

    B.  An Expired Patent in Reexamination Should Be Construed According to *Phillips*. ............................................................ 15

    C.  The Board Erred in Ruling that Claim 54 is Obvious in View of Barger and VCT86. ..................................................... 16

        1.  Barger and VCT86 do not disclose multiple different "formats." ......................................................... 18

            a.  As this Court previously confirmed, the claimed "format" is an automated call processing flow involving pre-recorded prompts and messages. ......................................... 19

**TABLE OF CONTENTS**
**(continued)**

Page

(1) Three prior district courts and this
Court have all interpreted "format" to
be an automated call processing flow
involving pre-recorded prompts and
messages. ..................................................... 19

(2) This Court's interpretation of "format"
should be maintained under the
principles of *stare decisis*. .......................... 22

(3) This Court's interpretation of "format"
is correct in view of the specification. ....... 25

b. The Board erred in finding that VCT86
discloses multiple formats. ................................... 28

c. The Board erred in finding that Barger
discloses multiple formats. ................................... 29

(1) The Board erroneously found that
Barger's first mode is a format. ................. 30

(2) Barger's first mode involves open-
ended customer service discussion,
which is not a format. ................................ 31

(3) The Board's analysis does not
demonstrate that Barger's first mode is
a format. .................................................... 33

2. VCT86 does not render obvious the use of DNIS-
based format selection in Barger. ................................... 35

a. VCT86 does not disclose the use of DNIS to
identify different numbers associated with
different formats. ................................................... 38

# TABLE OF CONTENTS
## (continued)

Page

    b.    Barger already discloses directing calls based
on different called telephone numbers, and it
would not have been obvious to graft into
Barger the extra DNIS service described by
VCT86. ................................................................. 38

  3.    Barger does not disclose providing processed data
via an automated voice message. .................................... 43

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..................... 46

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Brand v. Miller*,
    487 F.3d 862 (Fed. Cir. 2007) ....................................................... 41

*Cybor Corp. v. FAS Techs., Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998) (en banc) (Newman, J., dissenting) ......... 24

*Ex parte Papst-Motoren*,
    1 U.S.P.Q.2d 1655 (B.P.A.I. 1986) ............................................. 16

*In re Gartside*,
    203 F.3d 1305 (Fed. Cir. 2000) ............................................. 15, 42

*In re Glatt Air Techniques, Inc.*,
    630 F.3d 1026 (Fed. Cir. 2011) ............................................. 15, 38

*In re Huai-Hung Kao*,
    639 F.3d 1057 (Fed. Cir. 2011) ............................................. 15, 39

*In re Katz Interactive Call Processing Patent Litigation*,
    639 F.3d 1303 (Fed. Cir. 2011) ........................................... passim

*Katz Technology Licensing, LP and MCI Telecommunications Corp. v.*
    *AT&T Corp.*,
    63 F. Supp. 2d 583 (E.D. Pa. 1999) ........................................... 20

*In re Kotzab*,
    217 F.3d 1365 (Fed. Cir. 2000) ................................................ 5

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) ....................................................... 14, 42

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) ....................................................... 22, 23

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Miken Composites v. Wilson Sporting Goods Co.*,
  515 F. 3d 1331* (Fed. Cir. 2008) ............................................................ 23

*In re NTP, Inc.*,
  654 F.3d 1279 (Fed. Cir. 2011) ............................................... 14, 40, 42, 43

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................................................ 15

*In re Rambus Inc.*,
  694 F.3d 42 (Fed. Cir. 2012) ..................................................................... 15

*Rolls-Royce, PLC v. United Techs. Corp.*,
  603 F.3d 1325 (Fed. Cir. 2010) ................................................................. 42

*Sensonics, Inc. v. Aerosonic Corp.*,
  81 F. 3d 1566 (Fed. Cir. 1996) ................................................................. 14

*Verizon California Inc. v. Ronald A. Katz Technology Licensing, LP*,
  326 F. Supp. 2d 1060 (C.D. Cal. 2003) ..................................................... 20

## STATUTES

28 U.S.C. § 1295(a)(4)(A) ............................................................................. 2

28 U.S.C. § 2107(b) ....................................................................................... 2

35 U.S.C. § 103(a) ................................................................................... 4, 13

35 U.S.C. § 112 ........................................................................................... 21

35 U.S.C. § 141 ............................................................................................. 2

35 U.S.C. § 142 ............................................................................................. 2

MPEP § 2258 I.G ......................................................................................... 15

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

OTHER AUTHORITIES

37 C.F.R. § 1.304 .................................................................................. 2

37 C.F.R. § 41.79 ............................................................................. 9, 10

Federal Circuit Rule 15(a)(1) ............................................................... 2

H. R. Rep. No. 97-312, pp. 20-23 (1981) ......................................... 22

## I. STATEMENT OF RELATED CASES

The following cases are believed to be related to the present case:

- *In re Katz Interactive Call Processing Patent Litigation*, Appeal Nos. 2009-1450, 2009-1451, 2009-1452, 2009-1468, 2009-1469, 2010-1017; Newman, Lourie, and Bryson, Circuit Judges; decided February 18, 2011; Rehearing and Rehearing En Banc Denied April 22, 2011; published in the Federal Reporter as *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303 (Fed. Cir. 2011).

- *In re Ronald A. Katz Technology Licensing L.P.*, Appeal No. 2013-1138 (pending).

- *In re Ronald A. Katz Technology Licensing L.P.*, Appeal No. 2013-1139 (pending).

- Numerous actions pending in the *In re Katz Interactive Call Processing Patent Litigation* coordinated Multi-District Litigation ("MDL") proceedings, Case No. 2:07-ml-01816-RGK-FFM (C.D. Cal.).

## II.    STATEMENT OF JURISDICTION

This Court has exclusive jurisdiction over this appeal under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141.  This appeal is from a Decision on Request for Rehearing by the Board of Patent Trials and Appeals of the United States Patent and Trademark Office ("Board"), granting in part and denying in part Katz's request for rehearing and substantially incorporating a Decision on Appeal by the Board of Patent Appeals and Interferences, affirming the final rejection of U.S. Patent No. 5,351,285 claim 54 in Reexamination No. 90/008,057.

The date of the Board's decision, which is an appealable final order, is September 28, 2012.  On November 20, 2012, Katz timely filed a Notice of Appeal to this Court and served it on the Solicitor for the United States Patent and Trademark Office, pursuant to 35 U.S.C. § 142, 37 C.F.R. § 1.304, 28 U.S.C. § 2107(b), and Federal Circuit Rule 15(a)(1).

## III.  STATEMENT OF THE ISSUES

1.    Did the Board err by interpreting the term "format" to include spontaneous conversation between a caller and a live operator, where the specification teaches that a "format" is an automated interactive call processing flow involving pre-recorded prompts and messages, as confirmed by the settled construction understood by three district courts, this Court, and all litigation parties?

2.    Did the Board err by finding that VCT86[1] discloses multiple different formats, where VCT86 discloses only one automated call processing flow?

3.    Did the Board err by finding that Barger[2] discloses multiple different formats, where Barger discloses only one automated call processing flow?

4.    Did the Board err by ruling that VCT86 renders obvious the modification of Barger to use extra called-number signals automatically provided, at a cost, by the telephone network (DNIS), where Barger already discloses the use of different telephone numbers to connect calls to different

---

[1] "The Voice," VCT Quarterly Newsletter, Vol. 1, No. 2, Winter 1986 ("VCT86").  (JA001993-98.)

[2] U.S. Patent No. 4,071,698 to Barger, Jr. et al ("Barger").  (JA001979-92.)

endpoints and would obtain no advantage by restructuring the system to add DNIS?

5.      Did the Board err by finding that Barger discloses providing to the caller "processed data" via an automated voice message, where Barger describes only an "audio confirming message" that does not convey any processed data?

## IV.     STATEMENT OF THE CASE

This is an appeal from Board decisions dated June 6, 2011 and September 28, 2012 in Board Appeal No. 2010-006516, affirming the rejection of claim 54 of U.S. Patent No. 5,351,285 in *ex parte* Reexamination Control No. 90/008,057.  Katz appeals the Board's ruling that claim 54 is obvious under 35 U.S.C. § 103(a).

## V.      STATEMENT OF FACTS

### A.      The Patented Technology Dates from the Mid-1980s.

Patent validity must be assessed from the standpoint of a skilled artisan at the time of the invention, without reliance on hindsight.  The early timeframe of the patented technology in this case, and the widespread implementation of computer-telephony integration in the years after the inventions, provides a critical context for the Court's review of the Board's analysis.

The '285 patent is one of a related family of patents on the inventions of Mr. Ronald A. Katz, dating from the 1980s. The inventions are directed to inventive methods and systems enabling telephone callers to exchange information with computer systems through a telephone network.

The inventions at issue were made a quarter of a century ago, between at least 1988 and 1990. At the time of the inventions, "computers and telephony integration was in its infancy and call centers were in the early stages of automation," as Katz's expert explains. (JA001059-60 (Klein Declaration ¶¶ 9-10).) Certain prior art existed in the field of computer-telephony integration, but "the focus was on stabilizing the technology rather than exploring peripheral user applications." (*Id.* (Klein Declaration ¶ 10).)

The late 1980s saw "the early stages of what would be an explosive growth through the '90's to the present." (*Id.*) During this period of explosive growth, hundreds of companies began implementing automated call processing systems and purchased licenses to the Katz patent portfolio. Today, automated interactive telephone systems have become ubiquitous.

Figure 1 of the '285 patent, reproduced below, illustrates a typical structural arrangement underlying the patented inventions. Callers' remote terminals (*e.g.*, touch-tone telephones) connect through a communication

facility (telephone network) to a control system CS, which enables automated

interactions between callers and a computer system.  A processor P provides

multiple different formats with which a caller may interact, involving a call



FIG. 1

processing flow with pre-recorded prompts and messages guiding a caller's

exchange of information with the system.

(JA000037 ('285 patent, Figure 1).)

**B.     The     Patented     Technology     Has     Achieved     Extensive Commercial Success and Patent Licensing.**

The business enterprises arising from Mr. Katz's inventions have achieved considerable commercial and licensing success.[3]  Starting in 1988, Mr. Katz partnered with American Express to form Call Interactive, a pioneer in the field of automated interactive call processing services based on Mr. Katz's inventions.  Call Interactive's early clients included The New York Times, ABC's Monday Night Football, Beatrice Foods, and CBS News.  Call Interactive continues to provide automated telephony services today as First Data Voice Services, a unit of First Data Corporation.

Mr. Katz sold his interest in Call Interactive to American Express, and later formed Ronald A. Katz Technology Licensing, L.P. ("Katz"), which acquired the rights to Mr. Katz's patented inventions and is the appellant here.

The widespread implementation of the patented technology in the 1990s is reflected by the many licensees to the Katz portfolio, including the '285 patent.  Approximately 300 companies have purchased licenses, many of

_____

[3] Mr. Katz has decades of experience in business and innovation.  In 1961, Mr. Katz co-founded Telecredit Inc., the first company to provide online, real-time check credit authorization, and was named co-inventor on multiple patents issuing from these innovations.  Telecredit Inc. was later acquired by Equifax.

them, such as IBM, Microsoft, Hewlett-Packard, Sony, and Sprint, through amicable license negotiations without litigation.[4]  (*See* JA001358-59.)

The specific inventions at issue here have been a factor in the licensing decisions.  Claim 54 of the '285 patent has been specifically asserted against at least 19 different companies who subsequently purchased licenses. (JA001356-57.)  Claim 54 and its dependent claim 61 have also been asserted against defendants in lawsuits that are currently pending.

### C.    Procedural History of the '285 Patent and Reexamination

The '285 patent issued on September 27, 1994 from an application filed April 13, 1993, which ultimately claims priority to an application filed July 10, 1985.  The '285 patent expired in December 2005.

The PTO commenced the present reexamination proceeding, Reexamination Control No. 90/008,057, on July 27, 2006, based on a third-party request filed May 22, 2006.  The Examiner issued a non-final action rejecting claim 54 on June 13, 2008.  Katz filed a response on August 18, 2008.  The Examiner issued a final action rejecting claim 54 on March 20,

---

[4] Some of the license agreements were completed after the briefing filed with the Board in this case.

2009.  Katz filed a response on July 1, 2009.  The Examiner issued an

advisory action on July 21, 2009, maintaining the rejection.

Katz filed a notice of appeal to the Board and filed an Appeal Brief on

September 25, 2009, re-filed as corrected on December 22, 2009.  The

Examiner's Answer was filed January 14, 2010.  Katz filed a Reply Brief on

April 1, 2010.  The Board held an oral hearing on October 20, 2010.

On February 18, 2011, this Court issued its decision in *In re Katz

Interactive Call Processing Patent Litigation*, 639 F.3d 1303 (Fed. Cir. 2011),

which addresses certain issues pertinent to the present reexamination.

(JA001999-2025.)

On June 6, 2011, the Board affirmed the rejection of claim 54.

(JA000001-27.)  The Board reversed the rejection that Barger anticipates

claim 54, but affirmed the rejection that Barger in view of VCT86 renders

obvious claim 54.  (*Id*.)  On August 8, 2011, Katz filed a request for rehearing

of the Board's decision in view of this Court's decision in *In re Katz*.

(JA001557-1846.)

On September 28, 2012, the Board granted-in-part and denied-in-part

Katz's request for rehearing.  (JA000028-35.)  The Board maintained the

rejection of claim 54 as obvious over Barger in view of VCT86.  (*Id*.)

Katz appeals from the Board's decision on rehearing, which "is deemed to incorporate the earlier opinion reflecting its decision for appeal" except to the extent the earlier opinion is withdrawn.  37 C.F.R. § 41.79.

### D.    Asserted Prior Art References

Barger, a patent filed in 1977, describes a telephone call processing system designed to permit a caller to listen to an audio demonstration (such as a music selection) and then decide whether to buy the demonstrated product or service (such as a music recording).  (JA001979-92.)  Barger's Abstract summarizes the disclosed system, which includes a mode where the caller speaks with a live operator and a "push-button" mode where the caller interacts with an automated interface.  (JA001979.)

VCT86 is a newsletter dated 1986 with several articles describing various implementations of VCT call processing systems.  (JA001993-98.) One article describes an American Express system that uses DNIS to direct a merchant's call to a live operator or an automated interface.  (JA001993, 1997.)  In a first method, live operators assist calling merchants with credit authorizations.  (*Id*.)  In a second method, the calling merchant interfaces with an automated system for purchase approvals.  (JA001997.)

## VI.   SUMMARY OF THE ARGUMENT

1.      Claim 54 recites a system that implements multiple different formats.  As construed correctly by the MDL district court, the term "format" means an automated interactive call processing flow, guided by computer programming, where a caller exchanges information with a computer system using pre-recorded prompts and messages.  This construction is correct in view of the specification.  Also, this Court applied the very same construction in the Katz MDL Appeal as part of a dispositive ruling.

The Board erred because it improperly interpreted "format" to encompass spontaneous conversation between a caller and a live human operator.  The Court should maintain the settled construction of "format," both because it is correct and to respect the principles of *stare decisis*.

2.      Under the correct construction of "format," the Board erred by finding that VCT86 discloses multiple different formats.  VCT86 discloses an automated-interface method (the second method) that, at best, may be a single format, but it does not disclose any system that implements multiple different formats.  Its disclosed first method is not a format because it only describes a caller speaking freely with a live operator.

3.    Under the correct construction of "format," the Board erred by finding that Barger discloses a system implementing multiple different formats.  Barger discloses a first mode where the caller speaks with a live operator, and a second mode where the caller accesses a push-button interface system using a Touch-Tone telephone or similar equipment.  The Board found that Barger's "first mode" and "second mode" are different formats.  The Board erred because Barger's first mode is not a format under the proper claim construction.  Barger's first mode is not a call processing flow implemented by computer programming that exchanges information with callers through pre-recorded prompts and messages.  Barger's first mode does not involve a scripted exchange using pre-recorded prompts and messages, as a format requires.  Instead, Barger's first mode contemplates that the operator and caller engage in open-ended conversation to provide customer service as desired.

4.    Claim 54 recites a system that uses called-number identification signals such as DNIS to identify a format from among multiple formats.  The Board erred in ruling that VCT86 would have rendered it obvious to modify Barger to use DNIS to identify different formats.

First, VCT86 does not teach the use of DNIS to identify formats, so it cannot suggest such a modification to Barger's system.

Moreover, the Board demonstrated no advantage to Barger's system that would have prompted a skilled artisan to modify it to add the extra cost of DNIS signaling. Barger's system already suitably directs calls to different endpoints based on different telephone numbers, thereby achieving the "advantage" the Board would attribute to using the DNIS of VCT86. The Board's obviousness analysis improperly used the invention as a template for its own reconstruction, with the benefit of decades of hindsight.

5.     Claim 54 requires structure for providing to the caller "processed data" via an automated voice message. The Board found that Barger discloses this limitation through an "audio confirming message" played to the caller. The Board erred because there is no disclosure in Barger that this audio confirming message conveys any processed data as the claim requires.

## VII.  ARGUMENT

### A.     Standard of Review: Obviousness Must be Evaluated From the Time of the Claimed Invention, and Is Reviewed De Novo

A claimed invention is obvious only if it "would have been obvious *at the time the invention was made* to a person having ordinary skill in the art." 35 U.S.C. § 103(a) (emphasis added). Pursuant to this statutory mandate, this

Court and the Supreme Court have long warned against the dangers of hindsight bias. "A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon *ex post* reasoning." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). "Care must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit." *In re NTP, Inc.*, 654 F.3d 1279, 1299 (Fed. Cir. 2011) (reversing Board's obviousness ruling) (citations and internal quotation marks omitted).

> To draw on hindsight knowledge of the patented invention, when the prior art does not contain or suggest that knowledge, is to use the invention as a template for its own reconstruction — an illogical and inappropriate process by which to determine patentability.

*Sensonics, Inc. v. Aerosonic Corp.*, 81 F. 3d 1566, 1570 (Fed. Cir. 1996) (citations omitted).

These principles are particularly important here. The inventions date from the 1980s, and automated call processing services flourished into widespread commercial use starting in the 1990s. It is understandable that certain claimed functionalities might seem familiar or "obvious" today to someone who has used automated telephone services over the past 10 or 15

years.  But it is imperative to insulate such familiarity from any consideration

of what might have been obvious at the time of the inventions 25 years ago.

"Whether an invention is obvious is a question of law based on

underlying facts."  *In re Huai-Hung Kao*, 639 F.3d 1057, 1065 (Fed. Cir.

2011) (citing *In re Kotzab,* 217 F.3d 1365, 1369 (Fed. Cir. 2000)).  "This

court reviews the Board's ultimate determination of obviousness de novo and

the Board's fact findings for substantial evidence."  *Id.* (citing *In re Gartside,*

203 F.3d 1305, 1316 (Fed. Cir. 2000)).  "Substantial evidence is such relevant

evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Id.*  In addition, where the Board fails to establish a prima facie

showing of obviousness, the rejection should be reversed.  *In re Glatt Air

Techniques, Inc.*, 630 F.3d 1026, 1030 (Fed. Cir. 2011).

### B.      An Expired Patent in Reexamination Should Be Construed According to *Phillips*.

Where a patent in reexamination is expired and its claims cannot be

amended, as in the present case, the claims are interpreted pursuant to the

principles articulated in *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir.

2005) (en banc), the same standard used in infringement litigation.  *See*

MPEP § 2258 I.G; *In re Rambus Inc.*, 694 F.3d 42, 46 (Fed. Cir. 2012)

(noting MPEP § 2258 I.G applies to interpretation of expired patent-in-

reexamination, "similar to that of a district court's review"); *Ex parte Papst-Motoren,* 1 U.S.P.Q.2d 1655, 1656 (B.P.A.I. 1986).

**C.    The Board Erred in Ruling that Claim 54 is Obvious in View of Barger and VCT86.**

The following chart summarizes the Board's errors regarding claim 54.

| Claim 54 | Board Rulings | Board Errors |
|---|---|---|
| 54. An interface control system for use with, (1) a telephonic communication facility including remote terminals for individual callers, wherein said remote terminals may comprise a conventional telephone instrument including voice communication means and digital input means for providing data, and (2) a multiple port, multiple format processor for concurrently processing data from a substantial number of callers in any of a <u>plurality of formats, said telephonic communication facility automatically provides call data signals, as to indicate called numbers to select a particular format from said</u> | The Board ruled that Barger and VCT86 render obvious claim 54.<br><br>1.  The Board found that VCT86 discloses multiple formats.<br><br><br><br>2.  The Board found that Barger's first mode and second mode disclose multiple different formats.<br><br>3.  The Board ruled that VCT86 renders obvious the use of called number identification signals (DNIS) for Barger's second mode and third mode. | Barger and VCT86 do not render obvious claim 54.<br><br>1.  Under the correct construction of "format," VCT86 does not disclose multiple formats.  VCT86's first method (live operator discussion) is not a format.<br><br>2.  Under the correct construction of "format," Barger's first mode (live operator mode) is not a format.<br><br>3.  VCT86 does not render obvious the use of DNIS for Barger's first mode and second mode, which are not different formats in any event because Barger's first mode is not a format. |

| | | |
|---|---|---|
| plurality of formats, and (3) a plurality of live operator attended terminals with prompting capability <u>for a plurality of formats</u>, said interface control system comprising: | | |
| interface means for providing an introductory automated voice message relating to a specific format from <u>said plurality of formats</u>; | *In conjunction with the preamble, above.*<br><br>1.  The Board found that VCT86 discloses multiple formats.<br><br>2.  The Board found that Barger's first mode and second mode disclose multiple different formats. | *In conjunction with the preamble, above.*<br><br>1.  Under the correct construction of "format," VCT86 does not disclose multiple formats.<br><br>2.  Under the correct construction of "format," Barger's first mode (live operator mode) is not a format. |
| means for forwarding coupled to said interface means for forwarding a call from any one of said remote terminals to one of said plurality of live operator attended terminals; | [Undisputed] | |
| means for processing coupled to said forwarding means for processing caller information data entered by an operator at said live operator attended terminal; | [Undisputed] | |

| means for storing coupled to said processing means for storing certain select data from said caller information data entered by said operator; and | [Undisputed] | |
|---|---|---|
| means for reconnecting said call to said interface means to receive certain <u>processed data</u> via an automated voice message. | The Board found that Barger's "audio confirming message" provides processed data. | Barger's "audio confirming message" does not convey any processed data. |

### 1. Barger and VCT86 do not disclose multiple different "formats."

Claim 54 recites a system that concurrently implements multiple different "formats":

> a multiple port, multiple format processor for concurrently processing data from a substantial number of callers in any of <u>a plurality of formats</u> . . .
>
> a plurality of live operator attended terminals with prompting capability <u>for a plurality of formats</u> . . .
>
> interface means for providing an introductory automated voice message relating to a specific format from <u>said plurality of formats</u> . . .

(JA000053 ('285 patent, claim 54) (emphasis added).)

By its plain language, confirmed by the specification as discussed below, claim 54 requires a system concurrently implementing multiple different formats. The Board determined that Barger and VCT86 each

disclose a system implementing multiple formats.  The Board erred because it

applied an erroneous interpretation of "format."  Under the correct

construction, the Board's findings are unsupported by substantial evidence.

> **a.  As this Court previously confirmed, the claimed "format" is an automated call processing flow involving pre-recorded prompts and messages.**

The Board's decision relies on an erroneous interpretation of the term

"format."  (JA000018-19; JA000032-33.)  The Board's interpretation accords

with its interpretation in the related reexamination case before this Court

regarding the Katz '863 patent, Appeal No. 2013-1138.  Under the Board's

interpretation, a "format" may include spontaneous live conversation between

a caller and a live operator disclosed in the "first mode" of Barger and the

"first method" of VCT86.  (*Id*.)  The Board's interpretation is incorrect

because the claimed "format" is an automated call processing flow involving

pre-recorded prompts and messages, which excludes spontaneous live

conversation between a caller and operator.

> **(1)  Three prior district courts and this Court have all interpreted "format" to be an automated call processing flow involving pre-recorded prompts and messages.**

Three district courts have construed the term "format" in the '285

patent and related patents.  This Court applied the most recent construction,

by the MDL district court, in the Katz MDL Appeal.  In each case, "format" has been construed to mean a computerized call processing flow or program involving pre-recorded prompts and messages.

In the *AT&T* and *Verizon* lawsuits, the district courts construed the term "format" as follows:

- "a computer program that sets forth the content and sequence of steps to gather information from and convey information to callers through pre-recorded voice prompts and messages." *Katz Technology Licensing, LP and MCI Telecommunications Corp. v. AT&T Corp.*, 63 F. Supp. 2d 583, 613 (E.D. Pa. 1999);

- "a call process flow implemented by at least one computer program that sets forth the content and sequence of steps to gather information from and convey information to callers through pre-recorded prompts and messages." *Verizon California Inc. v. Ronald A. Katz Technology Licensing, LP*, 326 F. Supp. 2d 1060, 1071 (C.D. Cal. 2003).

In the pending Katz MDL cases, the district court construed "format" as follows, including as recited in the '285 patent:

Format refers to a call processing flow implemented by at least one computer program that sets forth the content and sequence of steps to gather information from and convey information to callers through pre-recorded prompts and messages.  Selection of, or branching to, a module or subroutine within a computer program does not constitute selection of a separate format. Selection of (or branching to), a second computer program by a first computer program, that together implement a call process

flow application also does not constitute selection of a separate format.

(JA0001887-92.)

When certain MDL cases reached this Court on appeal, the parties did not dispute the MDL court's construction of "format." *See In re Katz*, 639 F.3d 1303, 1320 (Fed. Cir. 2011) ("Katz MDL Appeal"). But that construction was at the core of a dispute over the MDL Court's ruling that a claim was invalid under Section 112. This Court applied that construction verbatim. *Id*. Based on that construction, this Court vacated a Section 112 invalidity ruling regarding claim 34 of U.S. Patent No. 5,974,120, a patent related to the '285 patent, because "the different call modes disclosed by the specification identify different formats." *Id*.

As this Court found, the '120 patent describes multiple different concurrently implemented formats, each of which is a distinct automated interactive call processing flow (format) with different pre-recorded prompts and messages: "For example, the specification describes asking different questions to and gathering different information from callers who dial an 800 number, as opposed to those who dial a 900 number." *In re Katz*, 639 F.3d at 1320.

The MDL district court's construction applied by this Court reflects that the claimed "format" requires an automated exchange between caller and system, "implemented by at least one computer program," through "pre-recorded prompts and messages." These features of a format necessarily mean that an operation based on spontaneous conversation between a human caller and a human operator cannot be a format and cannot be part of a format.

> **(2)** **This Court's interpretation of "format" should be maintained under the principles of *stare decisis*.**

This Court should maintain the construction of "format" it previously applied pursuant to the principles of *stare decisis*.

One of the primary reasons Congress created this Court was to ensure that "a given patent" is treated uniformly by the reviewing appellate court. The Supreme Court in *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), affirmed this Court's holding that patent claim construction is a matter of law exclusively for the court. The Court based its decision in part on "the importance of uniformity in the treatment of a given patent" so that the public can rely on a single court's pronouncement about the patent's scope. *Markman*, 517 U.S. at 391. "It was just for the sake of such desirable

uniformity that Congress created the Court of Appeals for the Federal Circuit
as an exclusive appellate court for patent cases." *Id.* (citing H. R. Rep. No.
97-312, pp. 20-23 (1981)). The Supreme Court likewise instructed that its
decision was intended to promote "intrajurisdictional certainty through the
application of *stare decisis*." *Markman*, 517 U.S. at 391.

This Court has accordingly recognized that *stare decisis* should govern
where the Court has previously applied a certain claim construction as a
"necessary predicate" to a dispositive ruling:

> Indeed, for us not to adopt the same claim construction in a case
> such as this, in which the construction of the claim term in
> question was a necessary predicate to the determination of a prior
> litigation before this court and is evident from the face of the
> intrinsic record without resort to expert testimony, would run
> counter to the Supreme Court's guidance on *stare decisis* in
> *Markman*.

*Miken Composites v. Wilson Sporting Goods Co.*, 515 F. 3d 1331, 1338 n.*
(Fed. Cir. 2008).

As noted above, this Court applied the MDL district court's correct
construction of "format" in vacating a ruling that a related patent does not
disclose multiple "formats." *In re Katz*, 639 F. 3d at 1320. The settled
construction of "format" was a necessary predicate to this Court's ruling that

the related patent discloses multiple "formats." That construction should be maintained.

*Stare decisis* is also important here because the many parties in the pending MDL lawsuits have relied on the construction of "format" adopted by the MDL court nearly five years ago and applied by this Court more than two years ago. The defendants adverse to Katz proposed the construction the MDL court adopted and will not be prejudiced by maintaining their proposed construction. To apply a different construction of "format" at this late stage could result in substantial prejudice, delay, and wasted effort in further litigation. As Judge Newman has explained:

> [E]ven one case wherein the Federal Circuit has deemed itself unconstrained by its own prior interpretation of the same patent removes finality and encourages relitigation of every patent. The promise of uniformity and finality, flowing from decisions of national effect, is a failed promise if we are not bound by *stare decisis* in our own claim interpretation.

*Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc) (Newman, J., dissenting).

The same principles also mandate that the Board should follow and apply the same construction this Court applied. The Board cited no authority permitting it to disregard the construction of "format" this Court applied.

24.

### (3) This Court's interpretation of "format" is correct in view of the specification.

The '285 patent specification confirms that the construction of "format" this Court previously applied is correct.

The '285 patent is based on a specification filed April 16, 1990 as a continuation-in-part of various earlier-filed Katz patent applications. The earlier-filed applications include the specifications for the Katz '863 and '120 patents, which are addressed in Appeal Nos. 2013-1138 and 2013-1139 co-pending before this Court.[5] Like those earlier related specifications, the '285 patent specification teaches that a "format" is an automated call processing flow, guided by computer programming, where the system exchanges information with a caller through pre-recorded prompts and messages. The '285 patent specification also teaches that the system concurrently implements multiple different formats, with each format selected for a caller interface based on "call data" such as called-number identification signals (DNIS), as recited in claim 54. The '285 patent teaches, for example:

---

[5] The '285 patent claims priority to application serial no. 07/194,258, filed May 16, 1988. The '258 application shares the specification of U.S. Patent No. 5,684,863, which is addressed in Appeal No. 2013-1138. The '285 patent is also related to U.S. Patent No. 5,974,120, based on a specification filed October 23, 1989. The '120 patent is addressed in Appeal No. 2013-1139.

- "Calls are selectively processed according to a specific operating format as indicated by call data. At any instant of time, the collective interface may involve several thousand calls simultaneously being processed through ports of the processor P. Exemplary selected formats of the processor might include: public polls, lotteries, auctions, promotions, sales operations and games." (JA000043 ('285 col. 3:35-42).)

- "One called number or set of numbers might be associated with an auction format of the processor P. Another number or set of numbers might be associated with sales operating formats. Still another called number or set of numbers might identify a game format, and so on." (*Id.* ('285 col. 4:31-36).)

None of the Katz patent specifications filed earlier than the '285 patent specification discloses that a format may be implemented using a human operator to interface with the caller. Unique within the Katz patent portfolio, the later-filed '285 continuation-in-part patent specification narrowly expands the possible ways the automated call processing flow may be implemented within the context of that patent. The '285 specification discloses that instead of a caller interacting with a computer system implementing the format only through voice-response equipment, the caller of the '285 patent may also interact with the computer system through a human operator who is directed by the computer to convey to the caller the specific pre-recorded prompts and messages dictated by the automated call processing flow. (JA000049, 44, 47,

46 ('285 col. 15:23-26, 6:10-14, 12:20-23, 9:9-11).)  In this operator-assisted

format, the computer system interacts with the caller in a specific format

through "appropriate format data," such as a "prompt pattern," thereby

scripting the exchange of information using pre-recorded prompts and

messages specific to the format.  (*Id.*)

Thus, in the '285 patent's operator-assisted format, the operator does

not engage in spontaneous conversation with the caller or provide general

customer service.  The operator is merely another interface between the caller

and the computer system.  The operator, acting in place of a voice response

based interface, acts on the content and sequence of steps the system is

programmed to use in order to gather information from and convey

information to the caller.  The computer dictates and controls the operator's

interactions with the caller, directing the operator to convey the system's pre-

recorded prompts and messages.

The '285 patent's operator-assisted format results from the number of

different formats that the operator must handle in the disclosed embodiment.

The processor P implements a variety of different formats:  "Exemplary

selected formats of the processor might include: public polls, lotteries,

auctions, promotions, sales operations and games."  (JA000043 ('285 col.

3:39-42).) In such embodiments, the operator could not satisfactorily provide general open-ended customer service for this wide diversity of different format types, and therefore conveys only the precise script provided by the processor P.

In sum, the '285 specification confirms the meaning of "format" applied by this Court and agreed by all parties and the Court in the pending MDL cases—an automated call processing flow where the system sets forth the content and sequence of steps to gather information from and convey information to callers through pre-recorded prompts and messages.

### b. The Board erred in finding that VCT86 discloses multiple formats.

Under the proper construction of "format," VCT86 indisputably does not disclose a system concurrently implementing multiple different formats as claim 54 requires. The VCT86 article the Board relies upon discloses only (1) a first method where the caller speaks freely with a live operator, and (2) a distinct second method where the caller interacts with an automated voice response unit. (JA001993, 97; JA000018).)

VCT86's first method is not a format. VCT86's first method does not involve computer programming setting forth a call processing flow with pre-recorded prompts and messages, as required for a format. Each live operator

is free to engage in any spontaneous conversation with the caller. Indeed, as the Board noted, the live operator "Authorizer" is required to "speak to" the caller before authorizing or denying the transaction, presumably to gauge the trustworthiness of the caller and the proposed transaction. (JA000018.) The correct construction of "format" excludes the type of spontaneous human conversation involved in the first method of VCT86. At best, VCT86 discloses a single-format system.

The Board accordingly erred to the extent that it found that VCT86 discloses a system implementing multiple formats.

### c. The Board erred in finding that Barger discloses multiple formats.

The Board also erred by finding that Barger discloses multiple different formats as claim 54 requires.

Barger describes three "modes" of operation:

- a first mode, where the caller interacts with a live operator;

- a second mode, a "push-button mode," where the caller uses a push-button telephone to interface with an automated system; and

- a third mode, where a customer at a retail location uses a Touch-Tone keyboard to call and interface with the same automated system.

In the present reexamination case, the Board did not find that Barger's second and third modes involve different formats.[6]  However, the Board found that Barger's first mode, the live operator mode, constitutes a format.  (JA000029-30.)  The Board erred.  Under the proper construction of "format," Barger's first mode is not a format.  Barger's first mode involves open-ended conversation between a caller and a human operator, without a script of pre-recorded prompts and messages as a format requires.

        **(1)    The Board erroneously found that Barger's first mode is a format.**

The Board found that Barger's first mode, in which the caller speaks with a live operator, discloses a "format."  (JA000020; JA000032-33.)  The Board noted the settled construction of "format" this Court applied in the Katz MDL Appeal, but nevertheless concluded that Barger's first mode constitutes a format because it is allegedly a "call process flow" and the system plays a "hello" message before the caller speaks with the operator.  (JA000032-33.)  In addition, the Board found it significant that the operator in Barger's first mode can transfer the call to the push-button mode.  (*Id.*)

---

[6] The Board erroneously found that Barger's second and third modes constitute different formats in co-pending Appeal No. 2013-1138.

The Board erred.  The first mode of Barger is not a format under the correct, settled claim construction.  In Barger's first mode, the caller freely engages in conversation with a live operator, without pre-recorded prompts and messages scripted by underlying computer programming.  As the Board correctly observed, in this mode "the customer communicates with the operator," rather than communicating with a processing system in a format as claim 54 requires.  (JA000020-21.)

> **(2)   Barger's first mode involves open-ended customer service discussion, which is not a format.**

Barger's description of the operator's discussions with the caller teaches that the operator engages in open-ended conversation with the caller to provide the personalized customer service required for Barger's mail-order service.  (*See* JA001986-87, 1982.)

In Barger's first mode, after the caller first connects with the operator, "[t]he operator then greets the customer and elicits from the customer identification data such as name address and account or credit card number," enters the information, and "asks the customer what may be done for the customer."  (JA001986 (Barger col. 4:61-67).)  The operator is free to greet the caller, request identification data, and ask what the caller would like, in

any manner desired.  The caller then may seek to place an order, or may request a demonstration.  (JA001986-87 (Barger col. 4:67-5:2).)

Next, to determine a demonstration to play to the customer, "[t]he operator then elicits from the customer sufficient identification of the particular demonstration," which may be any information sufficient to allow the operator to locate the item, such as recording artist, title, or label. (JA001987 (Barger col. 5:2-11).)  Again, the operator is free to obtain this various information as the operator sees fit, without any pre-recorded prompt or message.

Similarly, if the caller orders an item and there is a potential inventory or delivery problem, "[t]he operator may then discuss the problem with the customer."  (JA001987 (Barger col. 5:15-16).)  Again, the operator's discussion of the problem with the caller is open-ended—they "discuss" the issue as needed, without pre-recorded prompts and messages.

Barger's live operator service is thus very different from the operator-assisted formats the '285 patent contemplates.  In the '285 patent, each operator may need to assist a caller with any one of a wide variety of different format types, and therefore the processing system scripts the interaction with pre-recorded prompts and messages governing the interface so that the caller

interacts with the desired format.  (JA000043, 49, 44, 47, 46 ('285 col. 3:39-42, 15:23-26, 6:10-14, 12:20-23, 9:9-11).)  By contrast, Barger's operator mode is a personalized customer service, involving only one type of service (e.g., a music recording mail order service), where the operator engages in open-ended discussion to provide customer service without pre-recorded prompts and messages.

> **(3)    The Board's analysis does not demonstrate that Barger's first mode is a format.**

The Board's stated analysis does not support its finding that Barger's first mode is a format.  First, the Board states that the first mode and second mode have "different telephone call process flows, where the content and sequence of steps are different."  (JA000031.)  However, a format is not merely a "call process flow" with a series of steps—a format requires "a call processing flow implemented by at least one computer program that sets forth the content and sequence of steps to gather information from and convey information to callers through pre-recorded prompts and messages."  *In re Katz*, 639 F.3d at 1320.  A so-called "call process flow" summarizing a caller's conversation with a live operator, without pre-recorded prompts and messages, does not disclose a format.

As the second stated basis for its finding that Barger's first mode is a format, the Board notes that a "hello" message is played in Barger's first mode before the caller connects to the operator. (JA000020-21, 32-33.) This "hello" message is not a format, nor does it convert the live-operator customer service discussion into a format. The "hello" message does not set forth the content and sequence of <u>steps</u> (plural) to <u>gather information from</u> and convey information to callers through <u>pre-recorded prompts and messages</u> (plural), and thus cannot constitute a "format." *In re Katz*, 639 F.3d at 1320.

Finally, the Board notes that the caller can access the push-button interface of Barger's second mode after first speaking with the live operator in the first mode, who connects the caller to the push-button interface. (JA000033.) The ability to transfer from the first mode to the push-button interface does not convert the first mode into a format. The push-button interface (depicted in Barger Figure 4) is the only format in Barger's system, regardless of whether that format can also be accessed after the caller speaks with the live operator. The call in the first mode that starts from the caller's initial interaction with the live operator is not a format, regardless of whether the call may be later transferred to the push-button interface.

Moreover, claim 54 recites that the system selects each format based on called-number identification signals such as DNIS signals. (JA000053 (claim 54: "as to indicate called numbers to select a particular format from said plurality of formats").) In Barger, the caller dials a specific telephone number to access the first mode, or a different number to access the second mode. (JA001986 (Barger col. 3:3-8).) To the extent the first mode were to be considered a "call processing flow," that call processing flow accessed by the first number does not satisfy the requirements of a format, regardless of whether a caller in the first mode could ultimately transfer to the push-button interface.

For the foregoing reasons, the "first mode" in Barger where the caller speaks with the live operator is not a "format" as required by claim 54. Accordingly, the Board erred in finding that Barger discloses multiple formats. Because neither Barger nor VCT 86 discloses multiple formats, the Board's obviousness ruling is unsupported and should be reversed.

## 2. VCT86 does not render obvious the use of DNIS-based format selection in Barger.

As set forth above, neither VCT86 nor Barger discloses multiple formats. The references therefore do not disclose or suggest the "formats" elements of claim 54, which requires a system capability to receive called-

35.

number signals (such as DNIS) and use those signals to select a format from among multiple formats.[7]

However, in conjunction with its finding that VCT86 and Barger disclose multiple formats, the Board ruled that VCT86 would have rendered it obvious to modify Barger's system to use DNIS to identify different called numbers associated with Barger's first mode and second mode. The Board relied on VCT86's description of DNIS as follows: "In order to implement this system it was crucial that we be able to recognize and direct specific 800 numbers according to the DNIS identifiers." (JA000014.) In "this system" described in VCT86, all calls are received by a single piece of equipment:

---

[7] DNIS is an optional service where a subscriber can pay to have a telephone company separately deliver a signal indicating the called number along with the telephone call. The MDL district court construed "DNIS" and similar claim recitations to mean "signals or data that uniquely identify the number called." The construction of "DNIS" is not presently at issue, and Katz does not take any position on it herein.



(JA001997.)  Based on the DNIS signals, some incoming calls are directed from that single equipment to live operators, while other calls are directed to an automated interface.  (*Id*.)

Relying on this description, the Board reasoned that "modifying Barger to include DNIS identifiers for the 800 numbers, as taught by VCT, would have been obvious."  (JA000017.)  The Board's obviousness ruling is legally erroneous and should be reversed.

> **a.** **VCT86 does not disclose the use of DNIS to identify different numbers associated with different formats.**

As discussed above, VCT86 does not disclose multiple different "formats" under the proper claim construction.  VCT86 thus also fails to disclose using DNIS <u>to identify different formats</u>.  (JA001061.)  It only describes DNIS to direct a call to an operator or an automated interface.  Therefore, VCT86 cannot motivate a modification of Barger to use DNIS to identify different formats.  *See*, *e.g.*, *In re Glatt Air Techniques*, 630 F.3d at 1030 (in reexamination appeal, the Board erred in ruling that a prior art reference motivated a combination to render obvious "shielding" where that reference did not disclose shielding).  The Board's obviousness rationale is thus fundamentally unsound.

> **b.** **Barger already discloses directing calls based on different called telephone numbers, and it would not have been obvious to graft into Barger the extra DNIS service described by VCT86.**

Even assuming *arguendo* that Barger disclosed multiple formats *and* VCT86 disclosed the use of DNIS to identify formats, the Board erred by ruling that it was obvious to modify Barger's system to use DNIS as described in VCT86.

"[I]t matters greatly whether anything the skilled artisan would be prompted by the prior art to do is *in fact* within the scope of the pending claim." *In re Huai-Hung Kao*, 639 F.3d at 1066 (emphasis in original). The cited references, dating from 35 and 27 years ago respectively, would not have prompted the skilled artisan at the time to modify Barger to add DNIS. Rather than identifying any obvious improvement that the skilled artisan would have perceived, "[t]he Board improperly relied on hindsight reasoning to piece together elements to arrive at the claimed invention." *In re NTP*, 654 F.3d at 1299.

Barger describes a fundamentally different call processing system than VCT86. In VCT86, all calls are routed through a single equipment and then sorted or routed based on the additional DNIS information received at that equipment. By contrast, Barger's system already recognizes and directs calls on different incoming lines that physically correspond to different called telephone numbers—the purported advantage provided by VCT86's DNIS— without any demonstrated benefit from, or need for, re-structuring the system and adding the costs of DNIS and 800 service. Barger's live operator mode (first mode) and automated interface mode are accessed by different telephone numbers, using dedicated telephone lines in the same standard

manner that different telephone numbers typically reach different telephone lines. (JA001986, 1989 (Barger, col. 3:61-65, 4:35-42, 9:29-10:19).) As Katz's expert explained, these "dedicated telephone number connections" do not need extra call data signals such as DNIS. (JA001061, 1063.) Given these fundamental differences between VCT86 and Barger, the only suggestion to combine them would come from the invention of claim 54 itself, which the Examiner and Board have improperly used as a template.

The Board's stated reasoning does not support its ruling. The Board first notes that VCT86 mentions the ability to "recognize and direct specific 800 numbers according to DNIS identifiers," and concluded that adding DNIS into Barger's system "would provide the advantage of automatically recognizing and directing calls based on a specific 800 number." (JA000017.) However, as discussed above, Barger already discloses the ability to automatically recognize and direct specific calls based on different telephone numbers. The Board did not show that re-structuring the system to use DNIS signaling would provide any additional "advantage."

The Board further notes that VCT86 "teaches that both the first method and the second method operate concurrently and DNIS identifiers are used to direct an incoming call either to the operator or the automated voice response

unit." (JA000019.) Again, this statement does not demonstrate any improvement that adding DNIS would provide to Barger's system. As discussed above, Barger already discloses the use of different telephone numbers and line connections to direct an incoming call either to the operator or the automated interface. There is no showing that Barger's system is deficient or that adding the cost of re-structuring Barger's system to use DNIS signaling would improve that system.

Finally, the Board states that "DNIS identifiers were well-known for use in public telephone systems (Ans. 18), further suggesting a wide variety of uses." (JA000019.) This statement is unsupported and does not demonstrate any obviousness. While DNIS was known for certain limited uses in the prior art, such as routing calls to live operators, the Board and Examiner cited no evidence of the prior art "suggesting a wide variety of uses" for DNIS, much less the specific use required by the invention at issue. "[F]indings of fact by the Board must in all cases be supported by substantial evidence in the record." *Brand v. Miller*, 487 F.3d 862, 868 (Fed. Cir. 2007) (citation omitted). The Board's perception of the prior art "suggesting a wide variety of uses" is nothing more than a hindsight-based rationale to support its reconstruction of the invention in the prior art, with no proper support in the

record. *In re Gartside,* 203 F.3d 1305, 1314 (Fed. Cir. 2000) ("[T]he Board's decision must be justified within the four corners of th[e] record").

In sum, "the record contain[s] no evidence that would have suggested to or motivated an ordinarily skilled artisan" to modify Barger to achieve the claimed invention. *Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1339 (Fed. Cir. 2010). The prior art provides no "apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR,* 550 U.S. at 418.

This case is analogous to the *NTP* case. 654 F.3d at 1299. There, this Court rejected the Board's ruling that it would have been obvious to add the RF information transmission network of the Harrison reference into the AAPA reference. *Id*. at 1299-1300. The Court determined that "the Board's findings regarding the content of the references are supported by substantial evidence," but because the Board's conclusion of obviousness is reviewed *de novo*, the Court held "that, as a matter of law, the claims would not have been obvious to one of ordinary skill in the art." *Id*. The Court observed: "Given any network, we could likely carve out a possible 'interface' and combine it with Harrison to hold that the addition of a RF information transmission

network would have been obvious," and "the AAPA already discloses an RF network that connects portable computers to the system." *Id*. at 1299.

Similarly, here, the Board essentially reasoned that it was obvious to modify any prior art system that uses different telephone numbers to additionally receive and process DNIS signals—even where (1) the system already suitably uses different telephone numbers to connect calls to different endpoints, and (2) there is no showing of any advantage that would have been achieved, or problem that would have been solved, by re-structuring that system to add the cost of DNIS signaling. Here, just as in *NTP*, "[t]he Board improperly relied on hindsight reasoning to piece together elements to arrive at the claimed invention." *Id*. "This type of piecemeal analysis is precisely the kind of hindsight that the Board must not engage in." *Id*.

For these reasons, the Board's conclusion that it would have been obvious to modify Barger to use DNIS to identify formats is not supported by the record. The Board's obviousness ruling should be reversed.

### 3. Barger does not disclose providing processed data via an automated voice message.

Claim 54 of the '285 patent recites: "means for reconnecting said call to said interface means to receive certain processed data via an automated voice message." (JA000053.) In holding claim 54 to be obvious, the Board

found that the "audio confirming message" that Barger's system plays to a caller after a caller places an order discloses this limitation.  (JA000013, 22-24.)  The Board relied solely on Barger as allegedly disclosing this element.  (*Id.*)  The Board erred because it applied an erroneous claim interpretation, and its finding is not supported by substantial evidence under the correct claim interpretation.

The plain claim language requires that the voice message convey some data.  (JA000053 ('285 claim 54).)  The system reconnects the call to the interface means to receive certain "processed data" via an automated voice message.  (*Id.*)  The claim does not recite merely that the caller is to receive "an automated voice message."  The claim contemplates that the caller is to "receive certain processed data" via a voice message.

The specification confirms the plain meaning that some processed data must be conveyed by the voice message.  For example, the specification describes a voice message to a caller conveying processed data indicating that the caller is to be identified as number 24:  "'All operators are busy at the moment, but we will return your call as soon as possible.  Please touch your telephone buttons '2' and '4' to identify yourself as twenty-four for the return call'."  (JA000046 ('285 col. 9:11-15).)

By finding that Barger discloses the provision of "processed data" via a voice message, the Board implicitly adopted an erroneous claim interpretation. Barger describes that in the push-button mode, the system plays a demonstration and asks the calling customer if the customer wishes to buy the demonstrated item. (JA001990 (Barger col. 11:28-31).) If the customer responds "Yes," then "an audio confirming message is transmitted to the customer." (*Id.* at 11:32-34).) Figure 4 similarly depicts a "CONFIRM ORDER" event where the audio confirming message is played. (JA00001983 (Barger Fig. 4).)

The Board found that the "audio confirming message" discloses the provision of "processed data" via a voice message. The Board stated: "After the demonstration is played, the customer receives a confirmation message when making a purchase (i.e., Barger teaches "to receive certain processed data via an automated voice message)." (JA000023-24 (citing FF 10).)

The Board erred because it assumed a claim interpretation that an operation "to receive processed data" via an automated voice message could cover the provision of any responsive message, regardless of whether or not the message contained any data at all. Such a construction would render the phrase "processed data" meaningless in claim 54. Instead, this claim

limitation requires that some processed data is conveyed by the voice message, such as to specify that the caller is number "24" in the specification's example.

Under the proper claim interpretation, the Board's finding is not supported by substantial evidence. Barger does not describe that any data is conveyed by the "audio confirming message," much less any "processed" data. The audio confirming message discloses nothing more than a message played to confirm the order, such as "your order has been confirmed."

Accordingly, the Board's finding that Barger discloses this claim element is unsupported, and its obviousness ruling should be reversed.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Katz requests this Court reverse the Board's decision and confirm the patentability of claim 54 of U.S. Patent No. 5,351,285.

Dated:     March 5, 2013          COOLEY LLP

By: /s/Frank V. Pietrantonio
Frank V. Pietrantonio

Attorneys for Plaintiff
Ronald A. Katz Technology
Licensing LP

No. 2013-1137
(Reexamination No. 90/008,057)

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

IN RE RONALD A. KATZ TECHNOLOGY LICENSING L.P.

---

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board
Reexamination No. 90/008,057

---

## ADDENDUM TO
## APPELLANT'S OPENING BRIEF

LORI R. MASON
LOWELL D. MEAD
COOLEY LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306-2155
(650) 843-5000 (telephone)
(650) 857-0663 (facsimile)
lmason@cooley.com
lmead@cooley.com

FRANK V. PIETRANTONIO
JONATHAN G. GRAVES
COOLEY LLP
Reston Town Center
One Freedom Square
11951 Freedom Drive
Reston, VA 20190-5656
(703) 456-8000 (telephone)
(703) 456-8100 (facsimile)
fpietrantonio@cooley.com
jgraves@cooley.com

*Attorneys for Appellant*
Ronald A. Katz Technology Licensing L.P.

# UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/008,057 | 05/22/2006 | 5351285 | 6646-190 | 8657 |

35554          7590          06/06/2011
REENA KUYPER, ESQ.
BYARD NILSSON, ESQ.
9229 SUNSET BOULEVARD
SUITE 630
LOS ANGELES, CA 90069

| EXAMINER |
|---|
| KIELIN, ERIK J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/06/2011 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES

———————

Ex parte RONALD A. KATZ TECHNOLOGY LICENSING L.P.
Appellant

———————

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285
Technology Center 3900

———————

Before SCOTT R. BOALICK, KARL D. EASTHOM, and
KEVIN F. TURNER, Administrative Patent Judges.

BOALICK, Administrative Patent Judge.

DECISION ON APPEAL

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

This is an appeal under 35 U.S.C. §§ 134(b) and 306 from the final rejection of claim 54. Claims 1-53 and 55-79 are not subject to reexamination. We have jurisdiction under §§ 134(b) and 306.

An oral hearing was held on October 20, 2010. The record includes a written transcript of the oral hearing.

We affirm.

## STATEMENT OF THE CASE
### Reexamination Proceedings

A request for ex parte reexamination of U.S. Patent No. 5,351,285 (the '285 patent) was filed on May 22, 2006 and assigned Reexamination Control No. 90/008,057. The '285 patent, entitled "Multiple Format Telephonic Interface Control System" issued September 27, 1994 to Ronald A. Katz. The '285 patent is said to be assigned to Ronald A. Katz Technology Licensing L.P., said to be the real party in interest. (App. Br. 4.) The '285 patent is said to have an expiration date of December 20, 2005 by virtue of a terminal disclaimer. (App. Br. 6.) Thus, the '285 patent is now expired.

### Related Litigation

The '285 patent is or has been involved in numerous litigations, as summarized in the Related Proceedings Appendix. (App. Br. 59-83.)

### Appellant's Invention

Appellant's invention relates to a telephonic-computer interface system. (Col. 2, ll. 3-4; fig. 1.) The interface system features a telephonic

2

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

communication facility including remote terminals for individual callers (col. 2, ll. 12-14) and either a multiple format data processor for concurrently processing data from a substantial number of callers (col. 2, ll. 18-20) or a prompted live-operator station (col. 2, ll. 17-18). The interface system also includes a controller for receiving calls from the remote terminals and for receiving "signal-represented call data" (representing calling and called telephone numbers). (Col. 2, ll. 22-25.)

## The Claim

Independent claim 54 recites, with disputed limitations in italics:

54.   An interface control system for use with, (1) a telephonic communication facility including remote terminals for individual callers, wherein said remote terminals may comprise a conventional telephone instrument including voice communication means and digital input means for providing data, and (2) a multiple port, multiple format processor for concurrently processing data from a substantial number of callers in any of a plurality of formats, said telephonic communication facility automatically provides call data signals, as to indicate called numbers to select a particular format from said plurality of formats, and (3) a plurality of live operator attended terminals with prompting capability for a plurality of formats, said interface control system comprising:
interface means for providing an introductory automated voice message relating to a specific format from said plurality of formats;
means for forwarding coupled to said interface means for forwarding a call from any one of said remote terminals to one of said plurality of live operator attended terminals;
means for processing coupled to said forwarding means for processing caller information data entered by an operator at said live operator attended terminal;

3

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

> means for storing coupled to said processing means for storing
> certain select data from said caller information data entered by said
> operator; and
> means for reconnecting said call to said interface means to
> receive certain processed data via an automated voice message.

## The Rejections

Claim 54 stands rejected under § 102(b) as being anticipated by Barger (U.S. Patent No. 4,071,698).

Claim 54 stands rejected under § 103(a) as being obvious over Barger and VCT (American Express Implements Voice Response Credit Authorization, 1 VCT QUARTERLY NEWSLETTER 1, 5 (1986)).

Appellant relied upon the following[1] in rebuttal to the Examiner's rejection:

> Declaration under 37 C.F.R. § 1.132 of Jerry A. Klein, dated
> August 13, 2008 ("Klein Declaration" or "Klein Decl.").
>
> Statements by Financial Industry Leaders (App. Br. 36-37).
>
> Table of Companies (App. Br. 34-35).

## ISSUES

### § 102 Rejection – Barger

Appellant argues that Barger does not teach "said telephonic communication facility automatically provides call data signals, as to

---

[1] This opinion only addresses arguments made by Appellant. Arguments not made are considered waived. See 37 C.F.R. § 41.37(c)(1)(vii). We have considered the declaration evidence to the extent raised by Appellant's arguments.

4

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

indicate called numbers to select a particular format from said plurality of formats." (App. Br. 21-23; see also Reply Br. 5-7.)

Appellant's arguments present the following dispositive issue:

Does Barger teach "said telephonic communication facility automatically provides call data signals, as to indicate called numbers to select a particular format from said plurality of formats"?

## § 103 Rejection – Barger/VCT

Appellant argues that the combination of Barger and VCT does not teach or suggest "said telephonic communication facility automatically provides call data signals, as to indicate called numbers to select a particular format from said plurality of formats" (App. Br. 32-33) and further argues that "a combination of VCT with Barger is improper" (App. Br. 31). Appellant also argues that the combination of Barger and VCT does not teach or suggest an "interface means for providing an introductory automated voice message relating to a specific format from said plurality of formats" and a "means for reconnecting said call to said interface means to receive certain processed data via an automated voice message." (App. Br. 33.) In addition, Appellant points to evidence of commercial success. (App. Br. 34-37.)

Appellant's arguments present the following issues:

1. Does the combination of Barger and VCT teach or suggest "said telephonic communication facility automatically provides call data signals, as to indicate called numbers to select a particular format from said plurality of formats"?

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

2. Has the Examiner properly combined Barger and VCT?

3. Does the combination of Barger and VCT teach or suggest an "interface means for providing an introductory automated voice message relating to a specific format from said plurality of formats"?

4. Does the combination of Barger and VCT teach or suggest a "means for reconnecting said call to said interface means to receive certain processed data via an automated voice message"?

5. Has the Examiner properly considered Appellant's evidence of commercial success?

## FINDINGS OF FACT

### Barger

1.  Barger describes "a system for marketing merchandise or services capable of being demonstrated to prospective customers over telephone lines, such as phonograph records or tapes (cartridges or cassettes), books, plays, and tours, and for immediately accepting orders of selected merchandise or services." (Col. 1, ll. 8-13.) One object of the invention "is to provide a telephone system which enables a customer shopping for merchandise or services susceptible of audio demonstration to request that a particular demonstration be played over the telephone." (Col. 1, ll. 60-64.) Another object is to "provide a telephone system for customer selected audio demonstrations without human intervention in operation." (Col. 2, ll. 13-15.)

6

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

2.      The system includes three modes of operation.  (Col. 2, ll. 34-37;
        col. 3, ll. 3-5, 8-10.)  "In the first mode, the operator elicits required
        information from the customer, such as name and account number,
        demonstrations desired, and orders for the merchandise or services
        demonstrated."  (Col. 2, ll. 34-37.)  In the second mode, the
        "automatic telephone service . . . causes the data processor to
        communicate with the customer through prerecorded messages played
        to the customer through the audio repeating means and codes entered
        by the customer through his telephone keyboard."  (Col. 2, l. 66 to
        col. 3, l. 3.)  To access the second mode, the operator can transfer a
        customer's call (col. 2, ll. 65-67).  "An alternative way of entering this
        second mode of service is through the customer calling a distinct
        telephone number for a line which the data processor recognizes as
        being from a customer who has a push-button telephone and wishes
        automatic telephone service" (col. 3, ll. 3-8).  In the third mode, a
        modified automatic telephone service is provided to "customers of a
        licensed retailer of merchandise or services through the equivalent of
        push-button telephones."  (Col. 3, ll. 8-11.)  In the third mode, the
        customer may purchase the merchandise or services directly from the
        licensed retailer.  (Col. 3, ll. 12-14.)  In either the second or third
        mode, a data processor responds to codes entered by the customer
        using a push button phone without intervention from a human
        operator.  (Col. 3, ll. 14-17.)

3.      As illustrated in Figure 1, the basic telephone system includes a data
        processor 10 of a telephone record marketing store, an automatic

7

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

answering device 11, a public telephone system 12 with telephone couplers 13 (also referred to as "data couplers" (see, e.g., col. 3, ll. 64-65)) and telephones 14, a switching system 16, an audio program repeater 17 and a customer service operator 18. (Col. 3, ll. 41-55.) The telephones 14 can be a dial or push-button type. (Col. 3, ll. 45-46.) "The address information generated by the dial pulses, or push-button tones, establishes the basis for subsequent operations of the telephone system to connect a calling subscriber with the data processor 10 at a telephone record marketing store." (Col. 3, ll. 46-51.) The customer service operator 18 communicates with the data processor 10 through a video terminal 19, a type-writer keyboard and a numeric keyboard. (Col. 3, ll. 55-60.) The customer service operator 18 communicates with a customer through the switching system 16 and the telephone couplers 13. (Col. 3, ll. 54-56.)

4.      When a customer calls the telephone number of the telephone record marketing store, the transmitting and receiving equipment of the store is connected to the telephone system 12 by one of the data couplers 13. (Col. 3, ll. 61-65.) Figures 3A and 3B illustrate flow charts for an operator attended mode. (Col. 3, ll. 29-30.) "The data processor 10 is programmed with an interrupt routine to respond to each signal received from the automatic answering device 11 and automatically connect the customer's telephone line via a [data] coupler 13 to a predetermined one of a plurality of audio-program repeater [17] channels which plays a 'hello' message explaining that a customer service operator will be with the customer in a moment." (Col. 4,

8

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

ll. 10-17; "GO OFF-HOOK & CONNECT TO 'HELLO' MSG.,"
fig. 3a.) A customer service operator 18 is placed in communication
with the customer through the switching system 16. (Col. 4,
ll. 57-59.) "The operator then greets the customer and elicits from the
customer identification data such as name, address, and account or
credit card number." (Col. 4, ll. 61-64; "CONNECT TO OPER.;
TAKE INITIAL INFO.," fig. 3a.) The data processor 10 can display
the calling customer's "historical and credit verification data" from
memory using the customer's account number or credit card number.
(Col. 5, ll. 32-36.)

5.     To request a demonstration, the customer can provide to the customer
service operator 18 "a directory number assigned to the requested
demonstration and published in a catalog by the telephone record
store" (col. 5, ll. 4-7) or "the operator may search for it through the
data processor in which cross-indexing tables are stored for the labels,
titles and recording artists" (col. 5, ll. 9-11). ("OPERATOR
ENTERED SEL./DATA" and "SEL. REQUESTED?," fig. 3b.)
"While the requested demonstration is playing . . . the customer
service operator [18] is available to service other customers." (Col. 5,
ll. 20-22; "PLAY SELECTION," fig. 3b.) "When the requested
demonstration has been completed, the data processor [10] is
interrupted by the audio program repeater [17]." (Col. 5, ll. 23-25;
"OUTGOING MSG./SEL.," fig. 3b.) The data processor 10 then
disconnects the audio program repeater 17 from the customer's line
and switches that line back to the customer service operator 18.

9

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

(Col. 5, ll. 25-29; "CONNECT TO PREV. OPERATOR," fig. 3b.)  If the customer wishes to hear other demonstrations, the previously described procedure is repeated.  (Col. 5, ll. 42-45; fig. 3b.)  If the customer places an order, the "data processor [10] . . . transfers the order to an order processing system 20 with the name, address, and any other information required to fill the order, such as the account or credit card number."  (Col. 5, ll. 50-53.)

6.  As illustrated in Figure 2, which is described as a preferred embodiment (col. 3, ll. 27-28), the telephone system for the telephone record marketing system includes a data processor (col. 7, ll. 33-34), a dial telephone 24 or a push-button telephone 25, telephone data couplers 26, an automatic answering device 27 (col. 7, ll. 38-44), an audio program repeater 28 and a switching matrix 29 (col. 7, ll. 49-51).  The data processor includes a central processing unit (CPU) 21, a bus 22 and a random access memory 23.  (Col. 7, ll. 33-37.)  The CPU 21 communicates with other units (e.g., the random access memory 23) via the bus 22.  (Col. 7, ll. 35-37.)

7.  In the first mode of operation, the dial telephone 24 or the push-button telephone 25 is coupled to the CPU 21 with telephone data couplers 26 and the automatic answering device 27.  (Col. 7, ll. 38-44.)  "The CPU [21] responds to an incoming call with a command to an audio program repeater 28 to play a 'hello' message to the customer through a switching matrix 29."  (Col. 7, ll. 49-51.)  "[T]here is a credit verification function (CVF) 45 which the

10

JA000011

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

CPU [21] accesses under control of a programmed subroutine for credit verification." (Col. 8, ll. 60-64.)

8. For the Figure 2 embodiment, Barger also describes that "a customer having a push-button telephone communicates with the telephone record marketing system through the keypad of the telephone." (Col. 9, ll. 22-24.) For access to this automatic telephone service, a customer first establishes communication with the telephone data coupler 26 followed by entering "an established account number having a code reserved for push-button telephone customers." (Col. 9, ll. 36-42.) "If the credit verification function cannot validate the automatic push-button telephone customer, operator assistance is automatically initiated by the CPU." (Col. 9, ll. 42-45.)

9. "Otherwise the CPU will command the audio program repeater to play a prerecorded message to communicate with the customer as necessary. In that manner the transaction is carried out by the CPU without operator assistance. At each step, any entry required is made by the customer through his telephone keyboard in response to a message played by the audio program repeater under control of the CPU." (Col. 9, ll. 45-53.)

10. Figure 4 illustrates a flow chart for the automatic push-button telephone mode. (Col. 3, ll. 31-32; col. 11, ll. 18-19.) "The first part of the routine is similar to receiving a call in the operator attended mode for playing the 'hello' message, except that the message is one which concludes with an instruction for the customer to enter his

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

account number." (Col. 11, ll. 19-23; "GO OFF-HOOK &
CONNECT TO 'HELLO & INSTR' MSG.," fig. 4.) When the
customer enters a selection number (col. 11, ll. 25-26; "CUSTOMER
ENTERS SEL. NO.," fig. 4), "an excerpt of the selection is played as
a demonstration and an audio message is transmitted to the customer
asking him if he wishes to buy the selection" (col. 11, ll. 28-31;
"PLAY SELECTION" and "DO YOU WISH TO BUY?," fig. 4). "If
yes, an audio confirming message is transmitted to the customer, and
if not, the routine branches back to ask again for a selection
number . . . ." (Col. 11, ll. 32-34; "CONFIRM ORDER," fig. 4.)

VCT

11. VCT describes a voice response credit authorization system for
American Express designed to automate a high percentage of routine
authorizations. (P. 1; see also p. 5.) "The American Express service
policy is to never turn down a retail charge without first speaking
directly to the merchant or customer." (P. 1.) Merchants call a toll
free number and "[t]he voice response unit receives the call and directs
it according to the 800 number. These numbers designate how the
voice response unit should handle the call." (P. 1.)

12. In a first method, the voice response unit directs the call to an operator
called a "Relayer" who asks for and keys in the card number, merchant
number, and purchase amount, which then is sent to the host for
approval. (PP. 1, 5.) An authorization code for approved transactions
is sent to the voice response unit to be spoken back to the merchant.

12

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

(P. 5.)  If the transaction is not approved, the voice response unit transfers the call to an Authorizer who, in accordance with the American Express policy, will speak to the merchant and/or the customer before authorizing or denying the transaction.  (P. 5.)

13.    "In a second method, specific 800 numbers are handled entirely by the voice response unit."  (P. 5.)  Merchants respond to voice prompts in order to enter the card number, merchant number, and purchase amount using the telephone keypad.  (P. 5.)  The voice response unit communicates directly with the host, bypassing the Relayers.  (P. 5.)  An authorization code for approved transactions is sent to the voice response unit to be spoken back to the caller.  (P. 5.)  If the transaction is not approved, the call and appropriate data are transferred to an Authorizer for special handling.  (P. 5.)  "In order to implement this system it was crucial that we be able to recognize and direct specific 800 numbers according to the DNIS identifiers."  (P. 5.)

ANALYSIS

§ 102 Rejection – Barger

Appellant argues (App. Br. 21-23) that Barger does not teach "said telephonic communication facility automatically provides call data signals, as to indicate called numbers to select a particular format from said plurality of formats."

The Examiner found that the public telephone system 12, including the telephones 14 of Barger, corresponds to the claimed "telephonic communication facility."  (Ans. 7.)  The Examiner also found that "Barger

13

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

implicitly discloses telephonic communication facility automatically
provides call data signals, as to indicate called numbers" (Ans. 10) because
the dial pulses or push-button tones generate "address information" when a
customer calls a telephone record marketing store (Ans. 23-24). However,
we do not agree that the Examiner has made an adequate showing of
inherency.

Barger describes a telephone system for marketing merchandise or
services (FF 1) including a public telephone system 12 with dial or push-
button type telephones 14 (FF 3). Barger teaches that the dial pulses or
push-button tones generate "address information" when the customer calls
the telephone record marketing store. (FF 3.) Although Barger teaches the
generation of "address information," the Examiner has not adequately
established that the limitation "telephonic communication facility
automatically provides call data signals, as to indicate called numbers" is
necessarily present in Barger.

Accordingly, we reverse the rejection of claim 54 under 35 U.S.C.
§ 102(b).

### § 103 Rejection – Barger/VCT

With respect to the first and second issues, we are not convinced by
Appellant's arguments (App. Br. 32-33) that the combination of Barger and
VCT does not teach or suggest "said telephonic communication facility
automatically provides call data signals, as to indicate called numbers to
select a particular format from said plurality of formats" or by Appellant's

JA000015

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

arguments (App. Br. 31-32) that the Examiner improperly combined Barger
and VCT.

In the event that Barger did not teach the limitation "said telephonic
communication facility automatically provides call data signals, as to
indicate called numbers to select a particular format from said plurality of
formats," the Examiner found that this limitation was taught by VCT.
(Ans. 18.) In particular, the Examiner cited VCT for the disclosure of a
voice response unit that receives calls via multiple 800 numbers and directs
such calls according to DNIS (i.e., "dialed number identification signals" -
automatically provided by public telephone networks according to the
Examiner) identifiers. (Ans. 18-19; FF 13.) The Examiner concluded that
this claim feature would have been obvious "because Barger already
provides distinct telephone numbers for the modes, and DNIS would provide
a manner for *Barger's* system to direct the plurality of simultaneous calls to
the different formats, as taught by VCT." (Ans. 19.) We agree.

Again, Barger describes a telephone system for marketing
merchandise or services. (FF 1.) In a first mode of operation for the
telephone system of Barger, an operator requests required information from
a customer and places orders. (FF 2.) In a second mode of operation, an
automatic telephone service communicates with the customer through
prerecorded messages (FF 2) instead of the live operator (FF 1). To access
the second mode, the operator can transfer the customer's call or the
customer can dial a distinct telephone number. (FF 2.)

VCT describes a voice response credit authorization system used by
American Express to verify retail credit purchases. (FF 11.) In a first

15

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

method of VCT, a voice response unit directs a call to an operator to obtain
an authorization code. (FF 12.) In a second method of VCT, specific 800
numbers are handled entirely by a voice response unit, bypassing the
operator. (FF 13.) VCT further describes that it was crucial to be able to
recognize and direct specific 800 numbers according to DNIS identifiers.
(FF 13.)

A person of ordinary skill in the art would have recognized that
incorporating DNIS identifiers for the 800 numbers, as taught by VCT, with
the telephone system of Barger would provide the advantage of
automatically recognizing and directing calls based on a specific 800
number. See KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 417 (2007). Thus,
we agree with the Examiner (Ans. 19) that modifying Barger to include
DNIS identifiers for the 800 numbers, as taught by VCT, would have been
obvious.

Appellant argues that "a combination of VCT with Barger is
improper." (App. Br. 31) In particular, Appellant argues that "no reason
existed for combining the teachings because the problem solved by the
invention was not recognized, nor were the benefits" (App. Br. 31) and
"[t]he Examiner does not demonstrate any reason why Barger would have
been modified to use DNIS, when Barger already disclosed a way to
accomplish its objectives without the use of DNIS" (App. Br. 31-32).
However, as discussed previously, the combination of Barger and VCT is
based on the improvement of a similar device in the same way as in the prior
art.

16

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

 Next, Appellant argues that "to the extent VCT teaches use of specific 800 numbers (DNIS), the teaching is limited to a first method and application that indicates that calls are directed to customer service operators or a second method and application for merchant use (distinct from use by individual callers with accounts themselves) . . . ." (App. Br. 32.) To support this position, Appellant also points to paragraphs 17-19 of the Klein Declaration. (App. Br. 33.) A relevant portion of the Klein Declaration states that "VCT discloses in accordance with one method directing calls by the voice response unit to operators" and "[i]n a second method, VCT discloses 800 numbers for use by merchants." (Klein Decl. ¶ 18.)

 For the first method of VCT, the voice response unit directs the call to an operator. (FF 12.) For the second method of VCT, specific 800 numbers are handled entirely by a voice response unit, bypassing the operator. (FF 13.) Claim 54 broadly recites "individual callers," but does not exclude such individual callers from being merchants. Moreover, even if Appellant is correct that the claim term "individual callers" excludes merchants, VCT describes the use of voice response technology in a customer service environment and does not limit the use of voice response technology to merchants. (See FF 11.) Furthermore, the statements in the Klein Declaration relied upon by Appellant lack persuasive factual support because the Klein Declaration does not cite to any persuasive corroborating evidence. See In re Beattie, 974 F.2d 1309, 1313 (Fed. Cir. 1992.)

 Finally, Appellant argues that "VCT does not teach <u>concurrent</u> operation of different and separate automated applications by the voice response unit, where these applications are accessed by specific plural 800

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

numbers assigned to identify the different applications." (App. Br. 32-33.)
To support this position, Appellant also points to paragraphs 17-19 of the
Klein Declaration. (App. Br. 33.) A relevant portion of the Klein
Declaration states that the "one method directing calls by the voice response
unit to operators" and the "second method . . . for use by merchants . . . is
not the same as concurrent use of specific plural 800 numbers for different
applications operated by the voice response unit." (Klein Decl. ¶ 18.)

As discussed previously, the voice response unit directs calls to an
operator for the first method of VCT (FF 12) and specific 800 numbers are
handled entirely by a voice response unit for the second method of VCT
(FF 13). In other words, VCT teaches that both the first method and the
second method operate concurrently and DNIS identifiers are used to direct
an incoming call either to the operator or the automated voice response unit.
Also, these DNIS identifiers were well-known for use in public telephone
systems (Ans. 18), further suggesting a wide variety of uses. Furthermore,
the statements in the Klein Declaration relied upon by Appellant lack
persuasive factual support because the Klein Declaration does not cite to any
persuasive corroborating evidence. See Beattie, 974 F.2d at 1313.

Therefore, we agree with the Examiner that the combination of Barger
and VCT renders obvious the limitation "said telephonic communication
facility automatically provides call data signals, as to indicate called
numbers to select a particular format from said plurality of formats."
Furthermore, the Examiner has properly combined Barger and VCT.

With respect to the third issue, we are not convinced by Appellant's
arguments (App. Br. 33; see also App. Br. 23; Reply Br. 7) that the

18

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

combination of Barger and VCT does not teach or suggest an "interface means for providing an introductory automated voice message relating to a specific format from said plurality of formats."

The Examiner found that Barger teaches an "interface means for providing an introductory automated voice message relating to a specific format from said plurality of formats." (Ans. 12-13; FF 2-4, 7, 10.) In particular, the Examiner found that the automatic answering device 11, the telephone couplers 13 and the switching system 16 of Barger collectively correspond to the claimed "interface means." (Ans. 12; FF 3.) The Examiner further found that a "hello" message played to a calling customer for both the first mode and the second mode corresponds to a "means for providing an introductory automated voice message relating to a specific format from said plurality of formats." (Ans. 12-13; FF 2, 4, 7, 10.) We agree with the Examiner.

As previously discussed, Barger describes a telephone system for marketing merchandise or services (FF 1) in which a public telephone system 12 is connected to a data processor 10 of a telephone record marketing store via an automatic answering device 11, telephone couplers 13, a switching system 16 and an audio programmer repeater 17 (FF 3). Barger also describes a first mode in which an operator communicates with a customer (FF 2, 4, 7) and a second mode, in which a customer communicates with an automatic telephone service (FF 2, 10) (i.e., Barger teaches a "plurality of formats"). For the first mode, the audio programmer repeater 17 plays a "hello" message and explains that an operator will soon be available. (FF 4.) For the second mode, a customer is greeting with a

19

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

similar "hello" message and prompted to enter an account number. (FF 10.) In other words, Barger teaches "an introductory automated voice message relating to a specific format from said plurality of formats."

Appellant argues that "the Examiner does not demonstrate that the initial generic message 'HELLO' can be considered as relating to 'a specific format from said plurality of formats.'" (App. Br. 23.) To support this position, Appellant also points to paragraphs 13-16 of the Klein Declaration. (App. Br. 27.) A relevant portion of the Klein Declaration states that "[t]he claim requires the 'interface format' to provide an introductory automated voice message" but "[a] spontaneous greeting of a 'HELLO' from a human does not meet that requirement." (Klein Decl. ¶ 15.)

However, as discussed previously, the Examiner found that for both the first mode of Barger (i.e., customer communicates with the operator) and the second mode of Barger (i.e., customer communicates with the automatic telephone service) a particular automated "hello" message is played for the customer. (Ans. 12-13; FF 2, 4, 7, 10.) Thus, the Examiner has demonstrated that the "hello" message relates to "a specific format from said plurality of formats." For the first mode of Barger, the audio programmer repeater 17 plays the "hello" message (FF 4) rather than "a 'HELLO' from a human," as stated in paragraph 15 of the Klein Declaration. Furthermore, the statements in the Klein Declaration relied upon by Appellant lack persuasive factual support because the Klein Declaration does not cite to any persuasive corroborating evidence. See Beattie, 974 F.2d at 1313.

Therefore, we agree with the Examiner that the combination of Barger and VCT teaches or suggests an "interface means for providing an

20

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

introductory automated voice message relating to a specific format from said plurality of formats."

With respect to the fourth issue, we are not convinced by Appellant's arguments (App. Br. 33; see also App. Br. 23-27) that the combination of Barger and VCT does not teach or suggest a "means for reconnecting said call to said interface means to receive certain processed data via an automated voice message."

The Examiner found that Barger teaches a "means for reconnecting said call to said interface means to receive certain processed data via an automated voice message." (Ans. 17, 27-32; FF 5, 10.)  In particular, the Examiner found that the disclosure in Barger of switching the customer's line to play a demonstration followed by switching the line back to the operator after the demonstration corresponds to "reconnecting said call to said interface means." (Ans. 17, 27-29; FF 5.)  The Examiner also found that a confirmation audio message played to the customer corresponds to the claim feature "to receive certain processed data via an automated voice message." (Ans. 17, 30-32; FF 10.)  We agree with the Examiner.

Again, Barger describes a telephone system for marketing merchandise or services (FF 1) including a first mode and a second mode of operation (FF 2).  In the first mode, when the customer requests a demonstration from a customer service operator 18, the customer's line is connected to an audio program repeater 17.  (FF 5.)  When the demonstration has been completed, a data processor 10 switches the line back to the customer service operator 18 (i.e., Barger teaches a "means for reconnecting said call to said interface means").  (FF 5.)  In the second mode

21

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

or automatic push-button mode, a customer requests a demonstration by entering a selection number. (FF 10.) After the demonstration is played, the customer receives a confirmation message when making a purchase (i.e., Barger teaches "to receive certain processed data via an automated voice message"). (FF 10.)

Appellant argues that "the Examiner does not cite any disclosure from Barger that 'the caller is repeatedly transferred between a live operator and the automatic answering device to hear the pre-recorded demonstration'" (App. Br. 24) and "does not cite any disclosure from Barger showing that a call is first connected to the automatic answering device, and then not connected to the answering device, and then re-connected to the answering device" (App. Br. 24-25). To support this position, Appellant also points to paragraphs 13-16 of the Klein Declaration. (App. Br. 27.) A relevant portion of the Klein Declaration states that "[t]he claimed element requires a 'reconnect' from an operator to the automated system to receive processed data via an automated voice message," but "[r]eplacing operator functions with automated functions is not the same as using operator functions and then facilitating a reconnect to automated functions." (Klein Decl. ¶ 16.) However, as discussed previously, when the customer requests a demonstration from the customer service operator 18, the customer's line is connected to the audio program repeater 17 and when the demonstration has been completed, the data processor 10 switches the line back to the customer service operator 18. (Ans. 17, 27-29; FF 5.) Furthermore, the statements in the Klein Declaration relied upon by Appellant lack persuasive factual

22

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

support because the Klein Declaration does not cite to any persuasive corroborating evidence. See Beattie, 974 F.2d at 1313.

Next, Appellant argues that "[t]he Examiner apparently suggests that because the music <u>selection</u> was 'processed,' that somehow makes the <u>music itself</u> into 'processed data,'" but "music is not 'processed data' received 'via an automated voice message.'" (App. Br. 25.) However, as discussed previously, the Examiner cited to the confirmation message received by the customer when making a purchase in the automatic push-button mode as corresponding to the claim feature "to receive certain processed data via an automated voice message." (Ans. 7, 31-32; FF 10.)

Therefore, we agree with the Examiner that the combination of Barger and VCT teaches or suggests a "means for reconnecting said call to said interface means to receive certain processed data via an automated voice message."

## Secondary Considerations

To rebut the Examiner's obviousness rejections, Appellant points to evidence of commercial success. (App. Br. 34-37.) In particular, Appellant has provided a list of "at least 19 companies" that have taken a "full portfolio license." (App. Br. 34-35.) Appellant has also provided statements from leaders in the financial industry. (App. Br. 36-37.)

Objective evidence of nonobviousness (also called "secondary considerations") must always be considered in making an obviousness determination, Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1538-39 (Fed. Cir. 1983), but it is not necessarily conclusive, Ashland Oil, Inc. v.

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

Delta Resins & Refrac., Inc., 776 F.2d 281, 306 (Fed. Cir. 1985). A "nexus" is a legally and factually sufficient connection between the objective evidence and the claimed invention, such that the objective evidence should be considered in the determination of nonobviousness. Demaco Corp. v. F. Von Langsdorff Licensing Ltd., 851 F.2d 1387, 1392 (Fed. Cir. 1988). A "nexus" is required between the merits of the claimed invention and the evidence of secondary considerations in order for the evidence to be given substantial weight in an obviousness decision. In re GPAC, Inc., 57 F.3d 1573, 1580 (Fed. Cir. 1995); Stratoflex, 713 F.2d at 1539. The burden of proving commercial success (and other types of secondary considerations, such as long felt need) during prosecution is on the applicant or patent owner. See In re Huang, 100 F.3d 135, 139-140 (Fed. Cir. 1996). The burden of proving a nexus between the commercial success and the merits of the claimed invention during prosecution is also on the applicant or patent owner. Huang, 100 F.3d at 140 ("In sum, Huang simply has not carried his burden to prove that a nexus existed between any commercial success and the novel features claimed in the application.").

"It is well settled 'that objective evidence of non-obviousness must be commensurate in scope with the claims which the evidence is offered to support.'" In re Grasselli, 713 F.2d 731, 743 (Fed. Cir. 1983) (citing In re Tiffin, 448 F.2d 791, 792 (CCPA 1971)). The objective evidence is not commensurate (coextensive) in scope with the claimed subject matter if the claims are broader in scope than the scope of the objective evidence, e.g., if the product included elements or features not recited in the claims which may be responsible for the commercial success or praise. See Joy Techs.,

24

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

Inc. v. Manbeck, 751 F. Supp. 225, 229-30 (D.D.C. 1990) (and cases cited therein). This is related to the nexus requirement – where the objective evidence of nonobviousness is not commensurate in scope with the claimed invention, it is more difficult (but not impossible) to show that objective evidence is due to the merits of the claimed invention as opposed to unclaimed features.

With respect to Appellant's licensing program of the "full portfolio," we agree with the Examiner that a sufficient nexus has not been demonstrated. (Ans. 37-38.) Although Appellant argues that "[c]laim 54 clearly has been a contributing factor in the decision to license the technology covered by the full portfolio license" (App. Br. 34), Appellant has not established with convincing documentary evidence a sufficient connection between the decision of the "at least 19 companies" to obtain a license and claim 54 of the '285 patent. Furthermore, the licensing activity may be due to factors unrelated to the unobviousness of the claims of the '285 patent such as the license being mutually beneficial or less expensive than defending infringement suits. See EWP Corp. v. Reliance Universal, Inc., 755 F.2d 898, 907-08 (Fed. Cir. 1985).

In addition, Appellant has not made an adequate showing that the statements from leaders in the financial industry (App. Br. 36-37) are commensurate in scope with or have a sufficient nexus with claim 54. Each of the statements refers generally to the "Katz portfolio," "Katz patents," "patent portfolio," or similar language in reference to multiple patents. (App. Br. 36-37.)

25

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

Therefore, the Examiner has properly considered Appellant's evidence of commercial success.

Accordingly, we sustain the rejection of claim 54 under 35 U.S.C. § 103(a).

## DECISION

The decision of the Examiner to reject claim 54 is affirmed.

Requests for extensions of time in this ex parte reexamination proceeding are governed by 37 C.F.R. § 1.550(c). See 37 C.F.R. § 41.50(f).

<u>AFFIRMED</u>

cu

<u>FOR PATENT OWNER:</u>

REENA KUYPER, ESQ.
BYARD NILSSON, ESQ.
9229 SUNSET BOULEVARD
SUITE 630
LOS ANGELES, CA 90069

<u>FOR THIRD PARTY REQUESTER:</u>

JOHN L. WELSH
WELSH & FLAXMAN LLC
2000 DUKE STREET, SUITE 100
ALEXANDRIA, VA 22314

JA000027

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/008,057 | 05/22/2006 | 5351285 | A2DL-002/03US 305918-2017 | 8657 |

58249          7590          09/28/2012

COOLEY LLP
ATTN: Patent Group
Suite 1100
777 - 6th Street, NW
WASHINGTON, DC 20001

| EXAMINER |
|---|
| KIELIN, ERIK J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 09/28/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

*Ex parte* RONALD A. KATZ TECHNOLOGY LICENSING L.P.
Appellant

———————

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285
Technology Center 3900

———————

Before SCOTT R. BOALICK, KEVIN F. TURNER, and ERIC B. CHEN,
*Administrative Patent Judges.*

CHEN, *Administrative Patent Judge.*

DECISION ON REQUEST FOR REHEARING

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

Appellant requests rehearing under 37 C.F.R. § 41.52 of the Decision on Appeal entered June 6, 2011 ("Decision"), which affirmed the Examiner's final rejection of claim 54.

The Request for Rehearing has been considered. We *grant* the Request for Rehearing to modify the original Decision as follows:

The sentence at page 21, lines 22-25, of the Decision is replaced with the following:

> Barger teaches that in the first mode, an audio-program repeater plays a "hello" message before a customer speaks to a customer service operator. (FF 4.) Furthermore, Barger teaches that the customer can initially access the first mode and request the operator to transfer the customer's call to access the second mode (i.e., Barger teaches a "means for reconnecting said call to said interface means"). (FF 2.)

In addition, the sentence at page 22, lines 19-23, of the Decision is replaced with the following:

> However, as discussed previously, the customer's call is initially answered by an audio-program repeater that plays a "hello" message before the customer speaks to the customer service operator such that the customer can request transferring the call to access the second mode. (Ans. 17, 27-29; FF 2, 4.)

The Request for Rehearing is otherwise *denied*. Accordingly, the Request for Rehearing is *granted-in-part*.


## DISCUSSION

Claim limitation – "a plurality of live operator attended terminals with prompting capability for a plurality of formats"

In view of a Federal Circuit opinion, *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1320-22 (Fed. Cir. 2011) (addressing the claim term "format" with respect to claim 34 of related U.S.

Patent No. 5,974,120), Appellant urges that the term "format" should be construed as "'different' telephone call processing flows, where the content and sequence of steps [that] are different must be considered as different 'formats.'" (Req. for Reh'g 5.) Furthermore, in view of a District Court summary judgment order, *Ronald A. Katz Tech. Licensing, L.P. v. Time-Warner Cable, Inc.*, No. CV 2:07-ML-01816-B-RGK (FFMx), slip op. at 42-43 (C.D. Cal. Aug. 13, 2009) (interpreting the claim term "format" with respect to dependent claim 61 of U.S. Patent No. 5,351,285), Appellant also urges that the claim limitation "live operator attended terminals with prompting capability" should be interpreted as "stations or terminals attended by human operators that prompt the operators" such that "[t]he prompts may or may not be related to prompts used in automated formats." (Req. for Reh'g 15 (citation omitted).)

In view of "the correct interpretation of the term 'format,'" Appellant argues that "[a] combination of Barger and VCT does not disclose 'live operator attended terminals with prompting capability *for a plurality of formats*,' where each format is a distinct call processing flow with a certain content and sequence of steps for interacting . . . with callers." (*Id.*) In particular, Appellant argues that "[i]n its text accompanying Figure 3b, Barger mentions that an operator can 'step in and advance the transaction' through the use of 'prompting questions by the CPUs'" but "the disclosure is not in the context of a plurality of formats as recited in claim 54." (*Id.*) Appellant further argues that:

> The Board indicated that the first mode of Barger (i.e., customer communication with the operator) and the second mode of Barger (i.e., customer communicates with the automatic telephone service), a particular automated "hello"

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

> message is played for the customer. However, again, the "operator" in the first mode of Barger is quite different from the claimed operator attended terminal with prompting capability for a plurality of formats.

(*Id.* at 16 (citation omitted).)

However, page 7, lines 2-11, of the Decision (i.e., FF 2) describes the first mode and second mode of Barger, as follows:

> "In the first mode, the operator elicits required information from the customer, such as name and account number, demonstrations desired, and orders for the merchandise or services demonstrated." (Col. 2, ll. 34-37.) In the second mode, the "automatic telephone service . . . causes the data processor to communicate with the customer through prerecorded messages played to the customer through the audio repeating means and codes entered by the customer through his telephone keyboard." (Col. 2, l. 66 to col. 3, l. 3.) To access the second mode, the operator can transfer a customer's call (col. 2, ll. 65-67).

Thus, even if we adopted the claim construction advocated by Appellant, Barger nevertheless teaches the claim limitation "plurality of formats" because the first mode (i.e., the customer communicates with the operator) and the second mode (i.e., the customer communicates with the automatic telephone service) of Barger have different telephone call process flows, where the content and sequence of steps are different. Furthermore, page 8, line 19, to page 9, line 2, of the Decision (i.e., FF 4) describes the first mode of Barger, as follows:

> "The data processor 10 is programmed with an interrupt routine to respond to each signal received from the automatic answering device 11 and automatically connect the customer's telephone line via a [data] coupler 13 to a predetermined one of a plurality of audio-program repeater [17] channels *which plays a 'hello' message explaining that a customer service operator*

JA000032

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

>  *will be with the customer in a moment*." (Col. 4, ll. 10-17; "GO
>  OFF-HOOK & CONNECT TO 'HELLO' MSG.," fig. 3a.)

(Emphasis added.) In other words, Barger teaches that in the first mode, an
audio-program repeater plays a "hello" message before a customer speaks to
a customer service operator. (FF 4.) Furthermore, Barger teaches that the
customer can access the second mode by initially accessing the first mode
and requesting the operator to transfer the customer's call. (FF 2.) Again,
even if we adopt the claim construction advocated by Appellant, Barger
nevertheless teaches the claim limitation "live operator attended terminals
with prompting capability" because both the first mode and the second mode
of Barger include stations or terminals attended by human operators that
prompt the operators.

Claim limitation – "a multiple port, multiple format processor for
concurrently processing data from a substantial number of callers in any of a
plurality of formats"

  Next, Appellant argues that "the vague citations in VCT 86 fail to
show any multiple port, multiple format processor capable of processing
data in any of a plurality of formats or even an introductory message relating
to a specific format from the plurality of formats" and that "[t]he Board's
Decision does not explain how there is any introductory message relating to
a specific format from the plurality of formats." (Req. for Reh'g 16.)

  These are new arguments and evidence not raised in the Briefs before
the Board. Such new arguments will not be considered. "Arguments not
raised in the briefs before the Board and evidence not previously relied upon
in the brief and any reply brief(s) are not permitted in the request for
rehearing except as permitted by paragraphs (a)(2) and (a)(3) of this
section." 37 C.F.R. § 41.52(a)(1). Appellant has not identified a sufficient

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

reason for meeting one of these exceptions. Furthermore, the Examiner's

Answer cited Barger for teaching this claim limitation, rather than VCT.

(Ans. 8-10.)

Claim limitation – "means for reconnecting said call to said interface means to receive certain processed data via an automated voice message"

Last, Appellant argues that "Barger simply does not disclose that a

caller is first connected to an automated interface, then connected with an

operator, and then reconnected with the automated interface to receive

processed data." (Req. for Reh'g 17.) In particular, Appellant argues that

the "purported disclosure of 'switching the line back to the operator,' or in

other words '[w]hen the demonstration has been completed, a data

processor 10 switches the line back to the customer service operator 18.' . . .

would be one of connecting a call to a live operator, not reconnecting a call

to an automated interface means." (*Id.* at 16-17 (citation omitted).)

Upon consideration of Appellant's arguments, we modify the original

Decision to replace the sentence at page 21, lines 22-25, with the following:

> Barger teaches that in the first mode, an audio-program repeater
> plays a "hello" message before a customer speaks to a customer
> service operator. (FF 4.) Furthermore, Barger teaches that the
> customer can initially access the first mode and request the
> operator to transfer the customer's call to access the second
> mode (i.e., Barger teaches a "means for reconnecting said call
> to said interface means"). (FF 2.)

We further modify the original Decision to replace the sentence at page 22,

lines 19-23, with the following:

> However, as discussed previously, the customer's call is
> initially answered by an audio-program repeater that plays a
> "hello" message before the customer speaks to the customer
> service operator such that the customer can request transferring
> the call to access the second mode. (Ans. 17, 27-29; FF 2, 4.)

Appeal 2010-006516
Reexamination Control No. 90/008,057
U.S. Patent No. 5,351,285

Accordingly, Barger teaches a "means for reconnecting said call to said interface means to receive certain processed data via an automated voice message."

## CONCLUSIONS

The Request for Rehearing has been considered. As discussed previously, we *grant* the Request for Rehearing to modify page 21, lines 22-25 and page 22, lines 19-23, of the original Decision. The Request for Rehearing is otherwise *denied*. Accordingly, the Request for Rehearing is *granted-in-part*.

Requests for extensions of time are governed by 37 C.F.R. § 1.550(c). *See* 37 C.F.R. § 41.52(b).

## REHEARING GRANTED-IN-PART

babc

# United States Patent [19]

## Katz

[11] **Patent Number:** **5,351,285**

[45] **Date of Patent:** **Sep. 27, 1994**

|||||||||||||||||||||
US005351285A

[54] **MULTIPLE FORMAT TELEPHONIC INTERFACE CONTROL SYSTEM**

[75] Inventor: **Ronald A. Katz,** Los Angeles, Calif.

[73] Assignee: **First Data Resources Inc.,** Omaha, Nebr.

[21] Appl. No.: **47,241**

[22] Filed: **Apr. 13, 1993**

### Related U.S. Application Data

[63] Continuation of Ser. No. 509,691, Apr. 16, 1990, abandoned, and a continuation-in-part of Ser. No. 640,337, Jan. 11, 1991, which is a continuation of Ser. No. 335,923, Apr. 10, 1989, which is a continuation of Ser. No. 194,258, May 16, 1988, Pat. No. 4,845,739, which is a continuation-in-part of Ser. No. 18,244, Feb. 24, 1987, Pat. No. 4,792,968, which is a continuation-in-part of Ser. No. 753,299, Jul. 10, 1985, abandoned, said Ser. No. 509,691, is a continuation-in-part of Ser. No. 260,104, Oct. 20, 1988, Pat. No. 4,930,150, which is a continuation-in-part of Ser. No. 18,244, Feb. 24, 1987, Pat. No. 4,792,968, which is a continuation-in-part of Ser. No. 753,299, Jul. 10, 1985, abandoned.

[51] Int. Cl.$^5$ .......................................... **H04M 11/00**

[52] U.S. Cl. ...................................... 379/94; 379/95; 379/97; 379/88; 379/142

[58] Field of Search ...................... 379/94, 97, 96, 98, 379/93, 142, 95, 88, 91, 92

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,320,256 | 3/1982 | Freeman . |
| 4,757,267 | 7/1988 | Riskin ..................................... 379/97 |
| 4,785,408 | 11/1988 | Britton et al. ......................... 379/97 |
| 4,797,911 | 1/1989 | Szlam et al. . |
| 4,812,843 | 3/1989 | Champion et al. . |
| 5,001,710 | 3/1991 | Gawrys et al. ......................... 379/94 |
| 5,017,917 | 5/1991 | Fisher et al. ........................... 379/95 |

| | | |
|---|---|---|
| 5,097,528 | 3/1992 | Gursahaney et al. ............... 379/142 |

#### FOREIGN PATENT DOCUMENTS

0342295 11/1989 European Pat. Off. .... H04M 11/00

#### OTHER PUBLICATIONS

Conversant 1 Voice System: Architecture and Applications, by Robert J. Perdue and Eugene L. Rissanen, ATT Technical Journal, Sep./Oct., 1986, vol. 65, No. 5. The AT&T Multi-Mode Voice Systems-Full Spectrum Solutions for Speech Processing Applications, by S. D. Hester, et al., from the Proceedings of the 1985 AVIOS Conference, Sep., 1985.

*Primary Examiner*—Curtis Kuntz
*Assistant Examiner*—Stella L. Woo

[57] **ABSTRACT**

Call data signals actuated by a telephone terminal are provided from a telephone communication system to indicate call data as the called number, the calling number and the calling equipment. The call data signals address related control functions for selectively interfacing a live operator terminal or a multiple format multiple port data processing system. The interface connection involves providing a specific format as for automated processing or to prompt an operator. Screening tests and format selection are performed to make a determination. Individual telephone terminals and individual data formats are arranged and interfaced under controlled conditions specified by the call data. Time tests, history tests and demographic tests may be executed in addition to basic selection and qualification tests. Control may be executed from active data storage for assembled control words and record words. Record words for individual calls may be stored along with developed data.

**67 Claims, 5 Drawing Sheets**





FIG. 1

Case: 13-1137 Case: PARTICIPANTS ONLY Document: 18 Filed: 03/05/2013 Filed: 03/05/2013



FIG. 2

Case: 13-1137 CASE PARTICIPANTS ONLY Document: 18 Page: 94 Filed: 03/05/2013



*FIG. 3*

Case: 13-1137 Case: PARTICIPANTS ONLY Document: 18 Page: 95 Filed: 03/05/2013 Filed: 03/05/2013



Case: 13-1137 Case: 13-1137 CASE-PARTICIPANTS-ONLY Document: 96 18 Filed: 03/05/2013 Page: 96 Filed: 03/05/2013



FIG. 6

5,351,285

1

## MULTIPLE FORMAT TELEPHONIC INTERFACE CONTROL SYSTEM

### RELATED SUBJECT MATTER

This is a continuation of application Ser. No. 07/509,691 filed Apr. 16, 1990 and entitled "Telephone Interface Control System", now abandoned, which is a continuation-in-part of application Ser. No. 260,104 filed Oct. 20, 1988 and entitled "Telephonic Interface Control System", now U.S. Pat. No. 4,930,150 which is a continuation-in-part of application Ser. No. 018,244 filed Feb. 24, 1987 and entitled "Statistical Analysis System For Use With Public Communication Facility", now U.S. Pat. No. 4,792,968, which was a continuation-in-part of application Ser. No. 753,299 filed Jul. 10, 1985 and entitled "Statistical Analysis System For Use With Public Communication Facility", now abandoned. Also, this application is a continuation-in-part of application Ser. No. 07/640,337 filed Jan. 11, 1991, and entitled "Telephonic-Interface Statistical Analysis System", which is a continuation of application Ser. No. 07/335,923 filed Apr. 10, 1989, and entitled "Telephonic-Interface Statistical Analysis System", which is a continuation of application Ser. No. 07/194,258 filed May 16, 1988, and entitled "Telephonic-Interface Statistical Analysis System", now U.S. Pat. No. 4,845,739, which is a continuation-in-part of application Ser. No. 018,244 filed Feb. 24, 1987 and entitled "Statistical Analysis System For Use With Public Communication Facility", now U.S. Pat. No. 4,792,968, which is a continuation-in-part of application Ser. No. 753,299 filed Jul. 10, 1985 and entitled "Statistical Analysis System For Use With Public Communication Facility", now abandoned. The benefit of the earlier filing dates in the United States is claimed under 35 U.S.C. §120.

### BACKGROUND AND SUMMARY OF THE INVENTION

Over the past several years, substantial expansion has occurred in the technology of combining telephonic and computer systems. For example, telephone systems have been developed to readily transmit digital data. Various forms of modems are in widespread use to intercouple telephones and computers. However, at a more personal level, it also has been proposed to utilize the traditional dialing buttons of telephone instruments to provide digital data, as for various processing. In accordance with such arrangements, voice messages prompt callers to provide data by actuating the alphanumeric buttons of conventional telephones. These systems have been proposed in association with computers to provide various services and one such system is disclosed in U.S. Pat. No. 4,792,968, issued Dec. 20, 1988, to Ronald A. Katz from an application Ser. No. 018,244 filed Feb. 24, 1987.

With respect to telephonic-computer systems, attaining the interface format desired by an individual caller is sometimes complex and burdensome. Specifically, callers may be misdirected, screening may be ineffective and delays may be cumbersome. Also, records may be poor or non-existent. Furthermore, some situations exist where interface to a live operator is an important alternative. As a consequence, a need exists for an improved interface system for selectively interfacing a considerable number of individual callers with a multiple format processor, as to attain efficient and economical digital

2

and vocal exchanges along with prompting and data accumulation.

In general, the present invention comprises a telephonic-computer interface system accommodating digital and vocal (analog) telephonic communication and capable of handling a large number of calls to selectively interface prompted live-operator stations or formats in a computer processor. The selected interface is controlled, as by call (called number, calling number, etc.) and can be altered under control of an operator, developed data or operating conditions. Accordingly, the system of the present invention interfaces: (1) a telephonic communication facility including remote terminals for individual callers, e.g. conventional telephone instruments including voice communication means, and digital input means in the form of alphanumeric buttons for providing data and (2) either a prompted live-operator station or a multiple port, multiple format data processor for concurrently processing data from a substantial number of callers with respect to any of several formats.

The interface system incorporates a controller for receiving calls from remote terminals for association with ports in the telephonic computer apparatus, and which receives signal-represented call data (representing "calling" and "called" telephone numbers) along with equipment information. An index apparatus is controlled, as by the signal-represented call data, to select initially a live-operator or machine format of the processor so as to specify any conditions for the interface, at least one of the formats including at least one condition. A test apparatus may determine whether or not an individual call attains specified conditions and thereby controls switching structure for providing the actual interface. If a live-operator terminal is selected, or indicated as a secondary format, prompt data is provided to a select station. Data is recorded and processing procedures also may be controlled by call data.

### BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, which constitute a part of this specification, an exemplary embodiment exhibiting various objectives and features hereof is set forth, specifically:

FIG. 1 is a block diagram of a system constructed in accordance with the present invention;

FIG. 2 is a flow diagram illustrating the operating process of the system of FIG. 1;

FIG. 3 is a block diagram of a component portion of the system of FIG. 1;

FIG. 4 is a diagrammatic representation of a binary control word as registered and utilized in the system of FIG. 1;

FIG. 5 is a diagrammatic representation of a binary data record word as utilized and recorded in the system of FIG. 1; and

FIG. 6 is a flow diagram illustrating the operating process of the structure represented in FIG. 5.

### DESCRIPTION OF THE ILLUSTRATIVE EMBODIMENT

As required, a detailed illustrative embodiment of the present invention is disclosed herein. However, physical communication systems, data formats, and operating structures in accordance with the present invention may be embodied in a wide variety of forms, some of which may be quite different from those of the disclosed embodiment. Consequently, the specific structural and functional details disclosed herein are merely represen-

5,351,285

3                                                                 4

tative; yet in that regard, they are deemed to afford the best embodiment for purposes of disclosure and to provide a basis for the claims herein which define the scope of the present invention.

Referring initially to FIG. 1, a series of remote terminals T1–Tn (telephone instruments) are represented (left). The terminals T1–Tn are generally similar and accordingly only the terminal T1 is shown in any detail. The indicated terminals T1–Tn represent the multitude of telephone terminals existing in association with a communication facility CO which may comprise a comprehensive public telephone network.

The communication facility CO, along with the individual terminals T1–Tn, is coupled to a central processing station CS generally indicated by a dashed-line block. Generally with regard to the station CS, individual terminals T1–Tn are interfaced either with a processor P (upper right) or one of several live-operator stations OS1–OSn (lower left) through a call receiver unit CU and a switch SW. Essentially, the processor P and the switch SW cooperate (line 9) to control interfaces, with the processor P providing interface formats either (or both) to automate an interface or prompt a live operator at a station OS1–OSn. Note that the interface formats are stored as described below in the processor P.

In accordance herewith, individual telephone calls are preliminarily processed on the basis of signal-represented call data to identify a specific operating format for a station or the processor P. The preliminary processing may invoke screening tests to impose conditions or establish a test criteria for the switch SW to determine the acceptability of the call to interface with a specific operating format.

Calls are selectively processed according to a specific operating format as indicated by call data. At any instant of time, the collective interface may involve several thousand calls simultaneously being processed through ports of the processor P. Exemplary selected formats of the processor might include: public polls, lotteries, auctions, promotions, sales operations and games. Accordingly, the stations OS1–OSn may comprise a substantial number and the processor P may take the form of a sizable computer capable of simultaneously processing many calls involving several different formats. Although numerous possible configurations are available, for purposes of explanation, the processor P is illustrated simply as a block with multiple ports. Note that while the switch SW and the processor P may be integrated in a single system, they are separately illustrated to isolate the detailed structure and process of the present invention.

Input lines LI1 through LIn from the call receiver unit CU enter the switch SW to provide calling data and communication paths. Output lines LO1 through LOn function between the switch SW and the processor P as lines LS1–LSn operate to serve the stations OS-1–OSn. Note that various multiplexing techniques are well known in the telephonic art to communicate call data and may be employed in the system.

Considering the system somewhat summarily, individual calls originating at the terminals T1–Tn are coupled through the communication facility CO and the call receiver unit CU to the switch SW. Call data, representative of calls, actuates the switch SW to preliminarily process each call based on the desired format. For example, depending on the desired format (indicated by the called number and/or the equipment data signals)

calls are selectively coupled and processed. Furthermore, record data is assembled for storage.

Considering the system of FIG. 1 in somewhat greater detail, the exemplary telephone terminal T1 includes a handpiece 10 (microphone and earphone) and a panel 12 provided with a rectangular array of push buttons 14 in a conventional configuration. Of course, the handpiece 10 accommodates analog signals while the panel 12 is a digital apparatus. Generally, the handpiece 10 serves to manifest analog or voice signals to a caller.

In accordance with conventional telephone structure, alphabetic and numeric designations are provided on the buttons 14. For example, several of the buttons 14 carry three letters along with a decimal digit. Specifically, the button designated with the numeral "2" also carries the letters "A", "B" and "C". Thus, the buttons 14 encompass the numerals "0–9" two symbols, and the alphabet except for the letters "Q" and "Z". Consequently, the buttons 14 substantially accommodate the entry of decimal and alphabetic data.

At this stage, some specific aspects of the communication facility CO are noteworthy. Essentially, with telephonic dialing, the communication facility CO couples selective terminals (from the multitude of terminals T1–Tn) to the call receiver unit CU. In that regard, the unit CU at the central station CS may be reached by any of a plurality of called numbers. For example, the call unit CU might be reached by any of twenty telephone dialing numbers, each associated with a specific operating format of the processor P. One called number or set of numbers might be associated with an auction format of the processor P. Another number or set of numbers might be associated with sales operating formats. Still another called number or set of numbers might identify a game format, and so on.

Incoming calls to the call receiver unit CU are identified by call data in accordance with telephone system techniques. As described below, the call data may specifically include digital signals representative of the called number (DNIS), the calling number (ANI) (terminal number), and the terminal equipment.

In addition to attaining a preliminary interface with a selected format, individual calls may be screened based on the called number (identifying an operating format) and the calling number (caller identification) or the equipment. That is, the system of the present invention is based on a realization that signal-represented call data can be effectively utilized to selectively interface individual callers at remote terminals with specific operating formats of a data processor.

Considering the call data in somewhat greater detail, in accordance with current telephone systems, the communication facility CO may provide signal-represented call data for: the "called" number, the "calling" number, and the equipment involved, e.g. "pulse" or "tone" terminal. Specifically, operating telephone equipment termed "DNIS" automatically provides the called telephone number in digital form from the communication facility CO. Somewhat similarly, existing telephonic equipment designated "ANI" automatically indicates the caller's (calling) number in digital signal represented form. Generally, time shared lines carry such call data and also may provide call data indicating equipment. Thus, the call unit CU may receive the called number, the calling number, and a calling equipment designation (pulse or tone), collectively termed call data, which data is utilized to establish control functions, as for

5,351,285

5

example to select an operating format for a station OS-1-OSn or the processor P.

As described in detail below, call data is registered in the switch SW to perform distinct control operations. Specifically, a selection section 16 of the switch SW identifies a specific desired format for the stations OS-1-OSn or the processor P. Depending on the format, a testing section 18 of the switch SW may screen calls for interface connections.

Recognizing that the possibilities are great, formats for calls in accordance with the disclosed embodiment may be of three different classes. Specifically, call formats may specify any of the following operations:

1. couple to live operator station if possible or in accordance with a predetermined criteria; if no operator station available, couple to processor;
2. interface to processor;
3. either above format, but selectively re-couple to live operator station or processor depending on secondary conditions.

The ramifications of individual formats within the above classes may vary considerably; however, some examples will illustrate possibilities. A marketing format (class 1) might interface callers to a live operator if an operator is available. Upon receiving a call, the operator station OS1–OSn (FIG. 1) also receives and displays prompting format data for the attending operator. If an operator is not available (all stations OS1–OSn busy) the system provides an interface with the processor P and a format as to record the data for a return call by an operator. Alternatively, the processor completes the transaction with data provided by the caller that may be digital, digital and voice, or voice.

In a game format, say of class 2, a caller may be limited to interface the processor P. The interface may be contingent on initial test conditions, e.g. call data, caller record, time, etc.

Formats of class 3 involve a switch between live operator and processor depending on secondary conditions. For example, a polling format may switch from the processor P to an operator station OS1–OSn if the caller fails to provide digital data in a responsive form. Alternatively, an operator may command a switch to the processor P upon identifying a specific caller from whom data is to be taken.

In the illustrative system of FIG. 1, an operating process is executed as illustrated in FIG. 2. Each incoming call prompts a preliminary query as indicated by a block 20 concerning the availability of a line or port. In the absence of an available line, a busy signal is provided as indicated by the block 22. Alternatively, an available line results in a preliminary interconnect as indicated by a block 24 setting a conditional connection into operation.

As indicated by a block 26, during the screening or testing interval (typically measured in seconds or fractions of seconds) the caller remains on line and may receive a message. That is, the caller might hear silence or may continue to hear the traditional telephonic ringing sound. Alternatively, the caller might be given a brief vocal message to "stand by" as indicated by the block 26. In any event, the caller is held "on line" while the process continues.

With a call on a line, the communication facility CO (FIG. 1) provides signal-represented call data, e.g. the called number, the calling number, and the equipment designation. As indicated by block 28 (FIG. 2) signals representative of the call data are captured to perform

6

preliminary control and processing operations as will now be considered. Note that the selected formats will fall within one of the classes as stated above.

The initial test is illustrated by a query block 25 representing an operation to distinguish calls of class 1 (operator) and class 2 (processor). Calls for a format seeking an operator prompt a "yes" response from the block 25 and proceed to the test of a block 27, "is an operator available?". A "yes" determination advances the process to an operation indicated by a block 29. Specifically, the block 29 represents the operations of coupling a caller to an operator station and transferring the appropriate format data to the station for prompting the operator. If no operator is available (block 27) the process proceeds with automated control to attain an interface in accordance with an appropriate format. Specifically, a control word is fetched (block 36) to establish an operating format for interfacing the call. In that regard, the specified format may be very simple. For example, the call simply may be prompted to indicate identification for a return call. Alternatively, the format may incorporate conditions or other complications as explained below.

Returning to the query block 25, if the call is to be coupled to the processor, an initial test operation is indicated by a block 30. A validity test is performed, for example, a list of calling numbers may be compiled that are to be denied access to any interface with the processor P. Negative calling numbers may result either by the choice of the person responsible for the calling number terminal, or by the choice of the service operating the processor P (FIG. 1). For example, an accumulation of prior improper transactions from a terminal designated by a specific telephone number may provide a basis for complete disqualification. Equipment also may disqualify.

Recognizing that various circumstances may be involved with respect to the total disqualification of a calling terminal, in accordance herewith the test involves formulation of a validity bit as indicated by the query block 30. Acceptable calls set the validity bit at a binary "1".

If the calling terminal is invalid, ("no" from the block 30) the call is rejected as indicated by the block 32 with or without a message and the line is released as indicated by the block 34. Note that the time interval involved is very short and the rejection message may take various forms including a verbal comment, a busy signal or simply a disconnected signal.

If a positive validity bit ("1") is formed at the junction of the query block 30, a control word is fetched under command of the called number as indicated by the block 36. As described in detail below, a control word is available for each operating format of the processor P and is utilized to impose the conditions for an interface and the terms of any associated billing.

As indicated in FIG. 2, the fetched control word of the block 36 prompts an inquiry as to the conditions attendant the selected operating format as indicated by a query block 38. That is, in the process, the query of block 38 determines whether further conditions are imposed for attaining interface with the processor P. If no further conditions are imposed, the format is initiated by pursuing the connected interface as indicated by a block 40. Also, as indicated by a block 42, the call is logged or recorded as with respect to billing data for example.

5,351,285

7

If access to a format involves conditions ("yes" from the query block 38), tests are specified as illustrated by a block 44. That is, conditions for the interface are specified by the block 44. Of course, the specific tests may involve various criteria; however, in the illustrative embodiment, the conditions involve time, history and demographics. Each exemplary condition will now be considered somewhat preliminarily.

In the disclosed embodiment, time tests involve testing the time of the call against certain limitations. For example, it may be desirable to limit some formats to specific time intervals as in relation to a television broadcast, a real time auction and so on. Note that the time tests also may be related to specific terminal control and geographic areas treated on the basis of telephone area codes. Specific examples will illustrate.

Assume an operating game format that propounds questions to a caller based on knowledge of a particular television program. The program may be broadcast at different times in different geographic areas, and as a consequence it may be desirable to limit calls interfacing the processor format depending on the area code of calling numbers. Accordingly, time tests may involve solely the instant time, or various combinations of time and call data. The specific test is determined as indicated by a block 46 (FIG. 2) imposing detailed operating instructions for the format. The test results are then correlated as represented by a block 48.

As indicated above, in accordance with the described embodiment, another test involves a record as for example directed to the station identified by the calling number. As an example, the record might take the form of either a negative or a positive file (for an individual format). In that regard, all formats involving "pay to dial" (e.g. 976, 900 etc.) calls might be conditioned as a group. Generally, in the case of a negative file, certain numbers are recorded that are to be denied access to a particular operating format. In the case of a positive file, access to the operating format is available only to calling numbers listed in the file.

Considering exemplary implementations of the system, a negative file may be based on limited or restricted use (as in the case of a lottery) or prohibitive use (telephone terminal owner choice). Formats accessible on a "one-time only" basis also may be controlled by negative lists. Thus, an operating format may be inaccessible to a terminal, or may be accessible a specified number of times during a specified interval, e.g. three accesses per week. The historical test is symbolized in FIG. 2 by the query block 50 to conditionally actuate the related tests 52 as indicated in the block 48. History limitations also may involve format limits. For example, a give-away or dial-free format may be limited to some predetermined number of calls for a period, e.g. ten thousand calls per day. Thus, limits can be imposed on the economic exposure of a format.

Moving from the historic considerations, demographic tests may be specified as in relation to the geographic area manifest by the area code of the calling number. To consider a specific example, a public opinion poll may be conducted in which a particular geographic balance is defined. In such an operating format, calls may be accepted only until particular quotas are attained with respect to specified area codes. Such tests in the process are indicated by the query block 52, again to instruct the correlation block 48.

With the requisite tests established by selection of a format, the block 48 indicates resolving the acceptability of the call for the selected interface format. If the call is accepted, the process moves to initiate the selected format interface as indicated by the block 40. Conversely, if the call is to be rejected, the process moves to the step indicated by block 32, i.e. reject the call as with a message and release the line.

If a call is accepted, as represented by the block 40, there is a possibility that an established format may be aborted in favor of a different format. For example, interfacing the processor P, a qualified caller may fail to communicate digitally with the result that transfer to a live operator is commanded. Also, in certain situations, a connection to a live operator is to be terminated in favor of an interface to the processor. In either event, an existing format is terminated in favor of a fresh format. That phase of the process is illustrated by an "abort" line from the block 40 returning to the block 28. Thus, the process returns to re-assign the caller to a new format in accordance with fresh data. Thus, transfers according to class 3 operation are implemented along with the other classes of operation by the switch SW (FIG. 1).

An exemplary detailed structure of the switch SW (FIG. 1) for executing the process of FIG. 2 is represented in FIG. 3. In that regard, individual telephone calls are manifest from the call receiver unit CU (FIG. 1) comprising existing equipment as well known in the prior art. The call data is supplied through a line 60, upper left, FIG. 3. Note that the represented single line 60 is merely symbolic of a channel to carry call data and provide direct telephone communication.

Generally, the system of FIG. 3 illustrates elements of the switch SW of FIG. 1 for processing an individual call. As indicated above, the system of the present invention involves the simultaneous processing of many calls with the possibility that numerous calls are simultaneously being tested for a connection as explained above. Consequently, although the system of FIG. 3 is illustrated with respect to testing a single call, it is to be understood that sequential or parallel operations and multiplexing techniques, as well known and widely practiced in the computer field, are utilized to accomplish multiple processing operations as are described below with reference to FIG. 3.

The line 60 (FIG. 3, upper left) enters a line capture unit 62 through which signal-represented call data is supplied to a call data register 64. Accordingly, the call data is registered to be available for processing operations as explained generally with reference to FIG. 2.

The line capture unit 62 also is connected to a control unit 66. Structurally, the control unit 66 may take the form of various computer facilities incorporating memory and logic capability to sequence and control specific functions as explained below. Generally, the control unit 66 implements specific formats which may involve coupling a caller either to a live operator station OS1–OSn or to the processor P. In that regard, the control unit 66 provides a series of timing signals t1–t6 to sequence the operations of individual component blocks as illustrated. Note that to preserve clarity in FIG. 1, connections of timing signals t1–t6 are not illustrated. Also, the control unit 66 is connected to the operator stations OS1–OSn (line 67) to receive signals indicative of the availability of stations.

In addition to logic for controlled switching as described, the control unit 66 specifically includes a call register 68, a control register 70 and test control logic 72. The control register 70 receives format control

5,351,285

9 | 10

words specified, as by the called number and having a form as illustrated in FIG. 4.

Recapitulating, each of the operating formats has a control word for defining any access conditions or limitations to accomplish a specific format, e.g. connection to an operator station OS1–OSn or to the processor P (FIG. 1). The formats may vary considerably; however, a few examples are the following:

Class 1, connect the live operator if available and provide prompt data for the XYS Company telemarketing program, if operator not available, cue caller: "All operators are busy at the moment, but we will return your call as soon as possible. Please touch your telephone buttons '2' and '4' to identify yourself as twenty-four for the return call".

Class 2, couple qualified callers to computer P for polling interface.

Class 3, couple callers to computer P for the RST Company telemarketing program, however, transfer to live operator (and prompt) if caller is not responsive.

These formats are established by control words that are selected on the basis of call data. The control words are sixteen bits, illustrated as the first sixteen bits (1–16) registered as shown in FIG. 4. An additional group of registered bits (17–20) are provided from call data.

The initial three registered bits in the control register (FIG. 4) serve as test command bits respectively for a time test, a history test and a demographics test. The presence of a "1" bit in any of the first three bit locations specifies the requirement for testing compliance to specified conditions. A "0" bit indicates no test.

The bits "4 through 7" in the control register constitute a field 74 and specify time conditions in relation to the instant time of the call. The field 74 may specify eight distinct time conditions. For example, exemplary specified conditions for a format might be as follows:

Accept calls between 7:00 and 18:00,
Accept calls on Thursday between 9:00 and 10:00,
Accept calls from area code 213 on Wednesday between 15:00 and 16:00,
Accept calls from area code 602 on Wednesday between 16:00 and 17:00.

Essentially, the time condition field 74 (activated by the time bit "1" - first bit position) defines specific intervals during which calls will be accepted for the specific called number and may be further limited by the area codes. A wide range of possibilities are available to accommodate specific programs for individual formats.

A field 76 in the control register embraces bits "8" and "9" and defines the conditions for access to the format based on historical considerations. Thus, two bits are provided to indicate four possible historical limitations. Again, the test is specified by a "1" bit, in this instance in the second bit location of the register 70. The following limitations are exemplary of many possibilities as related to a single telephone number:

Accept one call per day (per caller),
Accept one call per week (per caller),
Accept one call per month (per caller),
Accept one call during any three-day period (per caller),
Accept only 10,000 calls (per format).

Continuing with respect to the contents of the register 70, as illustrated in FIG. 4, bits "10" and "11" constitute a field 78 specifying demographic test limitations. Again, a few examples will illustrate the various possibilities:

Accept calls only from area code 213,
Accept calls from area codes 213, 818 and 619,
Accept only 1,000 calls from area code 213,
Accept calls from area code 213 with the prefix numerals 619.

Again, the demographic test is imposed only upon the existence of a "1" bit, in this instance in the third bit of the control word. As in the other cases, specific possibilities are considerable.

The bits "12" through "16" of the control word constitute a field 80 and designate a selection code for the identified format. These five bits enable a substantial number of formats to be designated and coded with respect to various classifications. For example, calls of the class 1 specifying a desirable connection to a live operator station OS1–OSn might be encoded in a "000" decimal series, e.g. "001" indicates XYZ Company telemarketing program, "034" indicates RST Company program, and so on. Accordingly, a "0" in the most significant digit specifies a live operator format. Similarly, lottery formats might be encoded in a "100" decimal series, e.g. "101, 102, 103 . . . 110, 111, 112". . . and so on; auctions might be designated in a "200" series, e.g.: "201, 202, . . . ". By using decimal equivalent coding formats for various categories, exclusions may be concisely stated. For example, a calling number may be excluded from all lottery operating formats simply by the specification of decimal "100" in association with the calling number.

The data, as illustrated in FIG. 4 is loaded into the control register 70. Again, the first sixteen bits comprise the format control word and are provided from a look-up table 84 (FIG. 3, right, central) upon being addressed by call data from the register 64.

The last bits (bits 17–20) stored in the control register 70 are provided from an equipment and billing instruction index 86. That is, in response to the signal-represented call data indicating the called number and the equipment, the look-up table 84 and the index 86 supply data for loading the control register as indicated above.

While the control register 70 is loaded to specify the operation of the system, the call register 68 in the control unit 66 receives signals for additional control and to formulate a record of the call. Specifically, as represented in FIG. 5, the contents of the call register 68 includes an initial validity bit 88 for indicating that the called number is either on a positive list or is not on a negative list. The determination of the validity bit for location 88 is made by reference to a memory 90 (FIG. 3, central) addressed by the calling number.

While the calling number addresses data to indicate a validity bit, specific format exclusions also may be indicated as explained above with respect to certain formats. For example, certain classifications of formats or specific formats (as a lottery) may be identified as inaccessible for certain telephone terminals as identified by calling numbers. Other than lottery formats, certain discretionary formats also may initiate control to limit access. Accordingly, a field 89 in the call register 68 (FIG. 5, bits "2" through "6") is provided from the memory 90, addressed by the calling number to specify format exclusions. That is, the calling number addresses the memory 90 to load the field 89 and specify limitations. Consider a few examples of format exclusions or limitations for a calling number:

No lottery formats,
One lottery format per week,

JA000046

| 11 | 12 |

Two lottery formats per month of total cost under $25.00,

No auction sales,

Auction sales only with caller entered code I.D. 763.

Again, it will be apparent that many possibilities exist in applying various coding techniques, the above merely being exemplary. Also, as indicated above, a format may be void of any limitations or restrictions. In that event, as explained above, a connection or interface is promptly commanded by the format code.

The bits "7" through "26" stored in the call register 68 (FIG. 5) constitute a field 91 and indicate the time of a call. Signals representative of the instant time of a call to load the field 90 are provided from a time clock 92 (FIG. 3, upper left). Signals from the time clock 92 may be in a Julian code and are provided to the call register 68 and also to a time test logic network 94 (lower left).

The last bits (27–30) in the register 68 are provided from the call data. The bits "27" and "28" indicate format billing data and comprise a field 82. Again, representations are coded; however, with respect to the field 82 information is derived from the called number. For example, an "800" called number may indicate no billing with the representative code being stored in the field 82. As another possibility, a "976" prefix number, or "900" number, may indicate a specific charge in relation to the identified format.

The bits "29" and "30" comprise a field 83 and may actuate a special form of the selected format. In the disclosed embodiment, the field 83 registers call data, as to indicate that the calling terminal is a "pulse" (rotary dial) signal unit or a "tone" (touch) signal unit. In the instance of a rotary terminal, the format program may be modified to accommodate "pulse" signal operation or inject operator communication with a transfer to one of the stations OS1–OSn.

Recapitulating to some extent with regard to the composition of the call record word in the register 68 (FIG. 5), the memory 90 (FIG. 3) is addressed by calling number data to provide data for the validity bit at location 88 and the format-exclusion field 89. The time of call is stored in the field 91 from the clock 92. The billing and equipment data are provided by the index 86 in response to "calling" data signals.

Another element of memory, specifically, a recent activity storage 98 (FIG. 3, lower right) is separately illustrated for convenience of explanation. Essentially, the storage 98 receives words from the call register 63 to maintain a record of interface calls. The recent activity storage may periodically be purged to permanent storage if desired. Thus, the recent activity storage 98 accumulates an activity record of all interface participants with respect to specific formats and is utilized in the history test for determining that an instant calling terminal is within the specified historical limitations as provided from the memory 90.

The activity tests are performed by a history test logic network 100 (FIG. 3, lower central). In a related context, the demographics test as explained in detail above is performed by a demographics test logic network 102. The results of the test logic networks are communicated to the test logic 72 in the control unit 66. As a consequence, a switch unit 105 is actuated to either operatively couple the line 60 into a port of the processor P (FIG. 1) or reject the call. If a call is accepted for an interface, a signal is supplied from the test control logic 72 through a line 107 to the switch 105 during the interval of the timing signal T6. The signal in the line

107 also is supplied to a format address register 109 for addressing the processor P. The register 109 stores select data signals to address a specific operating format of the processor P.

Recapitulating to some extent, call data indicates an interface format of the processor P (FIG. 1) with associated limitations, conditions and billing provisions. Call data also indicates possible format limitations or conditions for a calling number. The system processes the data with respect to the conditions and limitations to selectively enable interface operations. Essentially, the call data specifies a format (processor or operator) and any conditions relating to the format. Representative data accordingly is provided from the look-up table 84 and the memory 90 to the control register 70 and the call register 68 respectfully. Preliminary conditions may or may not be involved; however, qualified calls for an operator involve tests of availability within the control unit 66 according to data received from the stations OS1–OSn (line 67). As a result, calls are either interfaced to an operator who receives a format prompt, or interfaced to the processor according to a specified format. Thereafter, a shift may command a redetermination and a transfer as described in detail below.

In view of the above structural and logic description of the system of FIG. 3, the process as described with respect to FIG. 2 and the stored control word forms as described with respect to FIGS. 4 and 5, a comprehensive understanding of the described embodiment may now best be accomplished by assuming an exemplary call and treating the individual responsive steps. Accordingly, assume the occurrence of a call as manifest on the line 60 (FIG. 3, upper left). Further, assume that the called number, "976 513 7777" designates a lottery format with limited access. Details of the limited access will be treated below.

Upon occurrence of the call, the line capture unit 62 seizes a line relationship and signals the control unit 66. Immediately, an interval of time signal t1 is initiated and the register 64 is loaded with the called number ("900 513 7777"), the calling number ("415 318 4444") and the equipment designation (tone or no tone). To the caller, the operations as now described involve an almost imperceptible delay.

During the following interval of timing signal t2, the call register 68 and the control register 70 are loaded as illustrated respectively in FIGS. 4 and 5. Specifically, the called number and equipment designation specify data to load the control register 70. The calling number ("415 318 4444") from the register 64, prompts the memory 90 to load the validity bit 88 and the format exclusions in the field 89 of the register 68. Concurrently, the time clock 92 loads the field 91 with signals representative of the current time.

If the call register 68 does not receive a validity "1" bit, the calling number is indicated to be barred with a consequence that the line is released by the control unit 66. In that regard, a voice generator 106 (FIG. 3, left central) may be actuated by the control unit 66 branching to the operation of timing signal t6. Accordingly, a message of denial may be provided on the line 60 prior to release of the line. Note that the voice generator 106 may be variously used to prompt or inform callers in certain preliminary selection operations supplemental to the specific operations disclosed below.

As indicated above, concurrently with the loading of the call register 68 (timing signal t2), the control register 70 also is loaded. Specifically, from the register 64, the

5,351,285

13    14

called number cues the look-up table 84 to fill most of the control register (bits "1" through "16" FIG. 4) The fields 82 and 83 are supplied from the index 86.

That is, distinct from the fields loaded into the control register 70 from the look-up table 84, the fields 82 and 83 are supplied from the index 86. In that regard, assume the called number (area code 976) indicates that the charge for the service of the call will be billed through the caller's telephone records. Assume that the field 83 indicates a "tone" terminal effective for a conventional digital interface.

At this point, some still further assumptions will be made to pursue the explanation of the detailed operations. Specifically, assume that the format specified by the called number ("900 513 7777") is a lottery format and includes limitations with respect to time, history and demographics. Accordingly, the initial three bits of the control word all will be "1" bits in the control register 70.

Assume further that the time conditions specified by the field 74 (FIG. 4) limit calls from area code 415 to days other than Sunday. Assume that the history field 76 of the control word imposes a limitation of one call per day per calling station. Assume that the demographics field 78 excludes any call from area codes "512", "412", "812", . . . (not "415"). Finally, assume the selected format (field 80) designates a specific lottery format, that is lottery "128".

In addition to registration of the data sets detailed above, because a history test is specified, the recent history storage 98 is cued during the interval of timing signal t3. The operation is through the memory 90 by the control unit 66 to prompt the supply of historical data (previously registered record words) for the telephone terminal designated by the calling number ("415 318 4444"). Specifically, during the interval of timing signal t3, the storage 98 supplies data on the calling number to the history test logic network 100. Such data is compiled into a test format as to indicate the number of calls per day, per week, and so on. Note that aggregate call totals may also be supplied as a test criteria. Thus, the control unit 66 coordinates the test criteria data preparatory to the test operations of the individual logic networks 94, 100 and 102.

To summarize, in accordance with the above assumptions, the test control logic 72 is set up to coordinate the following specific logic tests:

Time limitation test by network 94: accept calls from area code 415 except on Sunday,

History limit test by network 100: accept only one call per day per station,

Demographics test by network 102: accept no calls from area codes 512, 412, 812 . . . (415 not listed).

As explained above, in addition to the limitations specified, in relation to the format, further limitations may be specified by the calling number. Such limitations are specified by the field 89 in the register 68 (FIGS. 3 and 5). In the instant example, assume that according to the record word, participation in the lottery format is limited to the interval between 10:00 a.m. and 3:00 p.m., e.g. when minors are in school. The code for such a format is supplied during the interval of timing signal t3 from the field 89 of the call register 68 to further establish the set-up of the logic 94 acting through the test control logic 72.

Recapitulating with regard to the test control logic 72, essentially a program is defined imposing each of the limitations that are specified by the call data in sufficient detail that comparison tests are expediently performed by the networks 94, 100 and 102. It is stressed, as indicated above, that the tests are selectively performed only in the event a "1" bit appears in the representative first three bit locations of the control word format. In the illustrative example, all the tests were commanded and accordingly the test control logic 72 sets up the condition for tests to be performed by the networks 94, 100 and 102, all during the interval of timing signal t3. Of course, the specific example represents one possibility of a substantial number of programs that might be specified to the system.

With the test formats established in the test control logic 72, the logic networks 94, 100 and 102 are driven during the interval of test signal t4 to execute a program in accordance with the assumed example. The process may be variously implemented in logic using well known techniques and is detailed in FIG. 6. Consider the time test of the network 94. The time test logic network 94 approves an interface only if: the call is not from area code "415" on a Sunday and furthermore the call occurs between the hours of 10:00 a.m. and 3:00 p.m. As indicated in FIG. 6, a decision block 120 resolves the area-code "415" time test. If the area code is not "415", the logic proceeds to the next query block 122. Alternatively, if the area code is "415" the day must be tested against Sunday as indicated by the query block 124. An affirmative indication from the Sunday test of block 124 prompts a rejection as indicated by the block 126.

If the Sunday test of block 124 is passed, the program imposes another time test, that is the time-of-day test as indicated by the block 122. Again, a negative result prompts a rejection; however, a positive result involves the next step as indicated by the block 128.

Note that the operations designated by query blocks 120, 122 and 124 are performed by the time test logic network 94 (FIG. 3). The next test of the block 128 is performed by the history test logic 100. The block 128 (FIG. 6) involves a determination of whether or not the instant call is the first for the calling terminal on the instant calendar day. If not, the limitations are exceeded and the call is rejected. If the test is passed, the process next involves the demographic test logic network 102 (FIG. 3) to determine whether or not the call originated from an excluded area based on the calling number area code.

Area controls are illustrated by the query block 130 of FIG. 6. Specifically, the demographics test logic network 102 determines whether or not the current call is from a denied area. If so, the call is rejected as indicated by the block 126. Alternatively, if the area is not excluded, as illustrated by the block 134 in FIG. 6, the interface is accepted. In the instant case, the area "415" is acceptable.

In the operation of the system as illustrated in FIG. 3, the logic networks 94, 100 and 102 indicate test results to the test control logic 72 during the interval of the timing signal t5. The logic 72 correlates the test result for action by the control unit 66. If the imposed conditions are met (or if there are no conditions) the control unit 66 actuates the switch unit 105 and the address register 109 through the line 107 to perfect the interface from the line 60 (upper left) to either a port in the processor P (FIG. 1) or one of the operator stations OS-1–OSn. Essentially, the switching operation occurs during the interval of the timing signal t6. Concurrently, the address register 109 specifies the select oper-

5,351,285

15 16

ating format as stored in the processor P for direct use in an interface with a caller, or to be retrieved and supplied through the switch SW to prompt an operator at a station OS1–OSn.

Also during the interval of the timing signal t6, the contents of the call register 68 is stored in the recent history storage 98. Note that billing data is stored with the call words and may be selectively extracted from the storage 98. At the termination of the timing signal t6, the interface endures until there is a "disconnect" or an "abort".

If the processor P senses the existence of conditions specifying a shift between a processor interface and a live operator communication, the control unit 66 is actuated as indicated through line 115. Note that the abort signal is formed either in response to predetermined conditions in an interface with the processor P, or on command from an active operator station. The signal is also supplied to the look-up table 84 which becomes active if a transfer is conditional. That is, if a transfer is conditional, the tests as described above may be invoked. Conversely, if the transfer is unconditional, the control unit 66 simply actuates the switch 105 to make the change and prompts the format address register to establish the desired format or prompt pattern for an operator.

The formats may involve various records, however, in accordance with the system of the present invention affords considerable flexibility to program individual conditions and limitations for each interface format based on the call data (calling number and called number). An interface may involve no conditions or conditions may be imposed from the called number (format selection), the calling number, or both. Accordingly, effective control may be imposed depending upon the service requested as manifest by an individual format, the instant time, the history of use and the demographics involved. The imposed limitations may be non-existent or may involve a relatively complex test pattern as explained in detail above.

In the disclosed embodiment, an effective record of calls is accumulated in the recent history storage 98. Thus, a composite and detailed record is accumulated of individual calls as executed.

It is to be appreciated that numerous formats may be implemented and controlled utilizing the principles of the system as illustrated above. Accordingly, it is to be understood that the system of the present invention should be interpreted in accordance with the claims as set forth below.

What is claimed is:

1. An interface control system for use with, (1) a communication facility including remote terminals for individual callers, wherein said remote terminals may comprise a conventional telephone instrument including voice communication means and digital input means for providing data, (2) a multiple port, multiple format processor for interfacing a substantial number of callers in any of a plurality of formats to concurrently process data, and (3) a plurality of live operator stations with prompting capability for a plurality of formats, said interface control system comprising:

call data means for receiving signal-represented call data from said terminals including DNIS automatically provided by said telephonic communication system;

selection means coupled to said call data means for selecting one of said formats under control of said

call data including DNIS to thereby further specify imposed conditions that must exist for a connection of a call either to said multiple port, multiple format processor or one of said live operator stations in accordance with said select one of said formats, at least one of said formats having at least one imposed condition; and

interconnect switch means for providing format data and controlling connections from a calling remote terminal to a port of said multiple port, multiple format processor or one of said live operator stations under control of said selection means.

2. A system according to claim 1 further including test means to specify test conditions for certain of said formats and means to test compliance with said conditions to further control said interconnect switch means.

3. A system according to claim 2 wherein one of said test means comprises means for executing a test based on the time of a call.

4. A system according to claim 2 wherein one of said test means comprises means for executing a test based on the history of the calling remote terminal.

5. A system according to claim 2 wherein one of said test means comprises means for executing a test based on the demographics of the calling remote terminal.

6. A system according to claim 1 wherein said selection means includes a look-up table for specifying said formats addressed by call data.

7. A system according to claim 1 wherein said selection means includes a control storage location and means for setting control data in said control storage location responsive to said call data.

8. A system according to claim 1 further including a voice generator means for prompting a caller.

9. A system according to claim 1 further including means for storing data representative of calls.

10. A system according to claim 9 wherein said means for storing includes means for storing billing data.

11. A system according to claim 1 further including means to provide an abort signal, the system being responsive to said abort signal to reactuate said interconnect switch means for providing alternative connections with format data.

12. A system according to claim 11 further including test means to specify test conditions for certain of said formats and means to test compliance with said conditions to further control said interconnect switch means.

13. A system according to claim 1 wherein said selection means selects under control of DNIS signals.

14. A system according to claim 1 wherein said selection means selects under control of ANI signals.

15. A system according to claim 1 wherein said selection means selects under control of equipment type signals.

16. An interface control system for use with, (1) a communication facility including remote terminals for individual callers, wherein said remote terminals may comprise a conventional telephone instrument including voice communication means and digital input means for providing data, (2) a multiple port, multiple format processor for interfacing a substantial number of callers in any of a plurality of formats to concurrently process data, and (3) a plurality of live operator stations with prompting capability for a plurality of formats, said interface control system comprising:

call data logic for receiving signal-represented call data from said terminals including DNIS automati-

cally provided by said telephonic communication system;

selection logic coupled to said call data logic for selecting one of said formats under control of said call data including DNIS to thereby further specify imposed conditions that must exist for a connection of a call either to said multiple port, multiple format processor or one of said live operator stations in accordance with a select one of said formats at least one of said formats having at least one imposed condition;

test logic coupled to said selection logic for testing the imposed conditions to provide approval signals; and

interconnect switch means for providing connections from a calling remote terminal to a port of said multiple port, multiple format processor or one of said live operator stations under control of said selection logic and under control of said approval signals from said test logic.

17. A process for interfacing (1) a telephonic communication system including remote terminals either with (2) a multiple port, multiple format data processing system, said multiple port, multiple format data processing system for concurrently processing data from said remote terminals according to a plurality of formats, at least one of said formats having at least one condition for a calling terminal, or (3) one of a plurality of operator stations with prompting capability for a plurality of formats, and wherein said telephonic communication system provides call data signals, as to indicate called and calling numbers, said process including the steps of:

receiving said call data signals from said telephonic communication system for a calling remote terminal indicative of DNIS and ANI automatically provided by said telephonic communication system;

selecting a processing format either for said multiple port, multiple format processing system or one of said plurality of operator stations for the calling remote terminal under control of said data signals as the selected format;

testing the selected format in relation to said call data signals; and

conditionally interfacing said calling terminal to said multiple port, multiple format data processing system for execution of said selected format or to one of said plurality of operator stations under control of said testing of call data signals.

18. A process for interfacing (1) a telephonic communication system including remote terminals either with (2) a multiple port, multiple format data processing system, said multiple port, multiple format data processing system for concurrently processing data from said remote terminals according to a plurality of formats, at least one of said formats having at least one condition for a calling terminal, or (3) one of a plurality of operator stations with prompting capability for a plurality of formats, and wherein said telephonic communication system provides call data signals, as to indicate called and calling numbers, said process including the steps of:

receiving said call data signals from said telephonic communication system for a calling remote terminal indicative of DNIS and ANI automatically provided by said telephonic communication system, wherein said plurality of formats consist of at least one pay to dial format and one 800 toll free format;

selecting a processing format either for said multiple port, multiple port processing system or one of said plurality of operator stations for said calling remote terminal under control of said call data signals as the selected format;

testing the selected format in relation to said call data signals; and

conditionally interfacing said selected format to said calling remote terminal under control of said testing of said call data signals.

19. A method for interfacing (1) a telephonic communication system including individual remote calling terminals for individual callers with (2) a multiple port, multiple format data processing system, said multiple port, multiple format data processing system for concurrently processing data from said remote terminals according to a plurality of formats, at least one of said formats having at least one imposed condition for said remote terminals calling to interface said data processing system, and (3) a plurality of live operator attended terminals, and wherein said telephonic communication system includes the capability of providing call data signals, said method comprising the steps of:

receiving said call data signals from said telephonic communication system for said remote terminals calling to interface said data processing system including DNIS automatically provided by said telephonic communication system;

selecting for said remote terminals, a select processing format from said plurality of formats of said multiple port, multiple format data processing system under control of said call data signals including DNIS provided by said telephonic communication system;

testing said select processing format in relation to said call data signals;

conditionally interfacing said select processing format to said remote terminals under control of said testing in relation to said call data signals; and

selectively terminating certain select calls from said remote terminals in favor of said operator attended terminals.

20. A method for interfacing (1) a telephonic communication system including individual remote calling terminals for individual callers with (2) a multiple port, multiple format data processing system, said multiple port, multiple format data processing system for concurrently processing data from said remote terminals according to a plurality of formats, at least one of said formats having at least one specified condition for said remote terminals calling to interface said data processing system, and (3) a plurality of live operator attended terminals, and wherein said telephonic communication system includes the capability of providing call data signals, said method comprising the steps of:

receiving said call data signals from said telephonic communications system for said remote terminals calling to interface said data processing system including DNIS automatically provided by said telephonic communication system;

selecting for said remote terminals, a select processing format from said plurality of formats of said multiple port, multiple format data processing system under control of said call data signals including DNIS provided by said telephonic communication system;

testing said select processing format in relation to said call data signals;

5,351,285

19 20

conditionally interfacing said selected processing format to said remote terminals;

selectively terminating certain select calls from said remote terminals in favor of said operator attended terminals; and

transferring substantially all of said certain select calls from said operator attended terminals back to said multiple port, multiple format data processing system.

21. A method for interfacing a telephonic communication system according to claim 19, wherein said conditionally interfacing step further comprises the step of:

interfacing said selected processing format to said remote terminals based upon data entered by operators at said live operator attended terminals.

22. A method for interfacing a telephonic communication system according to claim 19, further comprising the step of:

providing signal-represented call data from said remote terminals including calling numbers as additional call data signals.

23. A method for interfacing a telephonic communication system according to claim 22, further comprising the step of:

providing said additional call data signals automatically from said telephone communication system (e.g. ANI).

24. A method for interfacing a telephonic communication system according to claim 22, further comprising the steps of:

storing a record of negative file data, said select processing format using said additional call data signals to access said record and obtain data to specify and test for negative file conditions; and

terminating calls from said remote terminals if said calling number matches said data obtained from said negative file data.

25. A method for interfacing a telephonic communication system according to claim 22, further comprising the step of:

storing a record of positive file data, said select processing format accessing said record based on said additional call data and obtaining data to specify and test for positive file conditions.

26. A method for interfacing a telephonic communication system according to claim 25, further comprising the step of:

terminating calls from said remote terminals if data to specify and test for positive file conditions is not located.

27. A method for interfacing a telephonic communication system according to claim 25, further comprising the step of:

recording terms of caller billing associated with said select processing format.

28. A method for interfacing a telephonic communication system according to claim 19, wherein a plurality of called numbers are associated with said select processing format.

29. A method for interfacing a telephonic communication system according to claim 19, further comprising the step of:

testing to limit access to said select processing format on a one-time only basis.

30. A method for interfacing (1) a telephonic communication system including remote terminals for individual callers to make individual calls with (2) a multiple port, multiple format data processing system, said multi-

ple port, multiple format data processing system for concurrently processing data from said remote terminals according to a plurality of formats, at least one of said formats having at least one condition for said remote terminals calling to interface said data processing system, and (3) a plurality of live operator attended terminals, and wherein said telephonic communication system provides call data signals, said method comprising the steps of:

receiving said call data signals from said telephonic communications system for said remote terminals indicative of DNIS automatically provided by said telephonic communication system;

selecting a select processing format from said plurality of formats of said multiple port, multiple format processing system under control of said call data signals;

testing said select processing format in relation to said call data signals to provide approval signals;

conditionally interfacing said select processing format to said remote terminals under control of said approval signals and said call data signals; and

storing data relating to said individual calls, along with any pay to dial billing data responsive to said call data signals.

31. A method for interfacing a telephonic communication system according to claim 30, further comprising the step of:

providing signal-represented call data from said remote terminals including calling numbers as additional call data signals.

32. A method for interfacing a telephonic communication system according to claim 31, further comprising the step of:

providing said additional call data signals automatically from said telephonic communication system (e.g. ANI).

33. A method for interfacing a telephonic communication system according to claim 32, further comprising the step of:

selectively extracting said pay to dial billing data.

34. A method for interfacing a telephonic communication system including remote terminals for individual callers to make individual calls with a multiple port, multiple format data processing system and a plurality of live operator attended terminals, said multiple port, multiple format data processing system for concurrently processing data from said remote terminals according to a plurality of formats, at least one of said formats having at least one condition for said remote terminals calling to interface said data processing system, and wherein said telephonic communication system provides certain call data signals, said method comprising the steps of:

receiving said certain call data signals from said telephonic communications system for said remote terminals calling to interface said data processing system including DNIS automatically provided by said telephonic communication system;

selecting for said remote terminals, a specific pay to dial processing format from said plurality of formats of said multiple port, multiple format processing system under control of said call data signals including DNIS;

testing said specific pay to dial processing format in relation to additional call data signals indicative of caller telephone number to provide approval signals; and

5,351,285

**21**

conditionally interfacing said specific pay to dial processing format to said remote terminals under control of said approval signals.

**35.** A method for interfacing a telephonic communication system according to claim 34, wherein said certain call data signals automatically provided by said telephonic communication facility include equipment data.

**36.** A method for interfacing a telephonic communication system according to claim 35, further comprising the step of:

automatically providing calling numbers (e.g. ANI) from said telephonic communication system as additional call data signals.

**37.** A method for interfacing a telephonic communication system according to claim 36, further comprising the step of:

testing said calling numbers (e.g. ANI) to specify use history conditions relating to said specific pay to dial processing format, for each of said individual calling terminals.

**38.** A method for interfacing a telephonic communication system according to claim 34, further comprising the step of:

testing to limit access of said remote terminals to a one time only use.

**39.** A method for interfacing a telephonic communication system according to claim 36, further comprising the steps of:

storing a record of negative file data, said specific pay to dial processing format accessing said record utilizing said automatically provided calling number data and obtaining data to specify and test for negative file conditions; and

terminating calls from said remote terminals if said calling number matches said data obtained from said negative file data.

**40.** A method for interfacing a telephonic communication system according to claim 39, wherein said test for negative file conditions is controlled by said calling numbers (e.g. ANI) automatically provided from said telephonic communication system as additional call data signals.

**41.** A method for interfacing a telephonic communication system according to claim 34, further comprising the steps of:

storing a record of positive file data, said specific pay to dial processing format accessing said record utilizing said caller telephone number data and obtaining data to specify and test for positive file conditions.

**42.** A method for interfacing a telephonic communication system according to claim 41, wherein said test for positive file conditions is controlled by calling numbers (e.g. ANI) automatically provided from said telephonic communication system as additional call data signals.

**43.** A method for interfacing a telephonic communication according to claim 34, further comprising the step of:

processing certain select of said remote terminals calling to interface said multiple port, multiple format data processing system based on said call data signals to connect said remote terminals to one of said plurality of live operator attended terminals.

**44.** A method for interfacing a telephonic communication according to claim 43, further comprising the step of:

**22**

automatically connecting certain of said remote terminals to certain of said plurality of live operator attended terminals where said individual callers are appropriately prompted.

**45.** A method for interfacing a telephonic communication according to claim 34, wherein said testing step further comprises the step of:

executing a test based on historical limitations applied to an individual format and utilizing DNIS to control said test.

**46.** A method for interfacing a telephonic communication system including remote terminals with a multiple port, multiple format data processing system, said multiple port, multiple format data processing system for concurrently processing data from said remote terminals according to a plurality of formats, at least one of said formats having at least one imposed condition for said remote terminals calling to interface said data processing system, and wherein said telephonic communication system automatically provides call data signals, said method comprising the steps of:

receiving said call data signals from said telephonic communications system for said remote terminals including call data signals indicative of DNIS automatically provided by said telephonic communication system;

selecting for said remote terminals, a select processing format from said plurality of formats of said multiple port, multiple format processing system under control of said call data signals;

testing the select processing format in relation to said call data signals to limit access by said remote terminals to a one time use; and

conditionally interfacing said select processing format to said remote terminals responsive to said testing step.

**47.** A method for interfacing a telephonic communication system according to claim 46, further comprising the step of:

automatically providing calling numbers from said telephone communication system (e.g. ANI) as additional call data signals.

**48.** A method for interfacing a telephonic communication system including remote terminals with a multiple port, multiple format data processing system, said multiple port, multiple format data processing system for concurrently processing data from said remote terminals according to a plurality of formats, at least one of said formats having at least one imposed condition for said remote terminals calling to interface said data processing system, and wherein said telephonic communication system provides call data signals, said method comprising the steps of:

receiving said call data signals from said telephonic communications system for said remote terminals including DNIS and ANI automatically provided by said telephonic communication system;

selecting a pay to dial processing format from said plurality of formats of said multiple port, multiple format processing system under control of said call data signals including DNIS;

testing said pay to dial processing format in relation to said call data signals to provide test result signals;

conditionally interfacing said pay to dial processing format to said remote terminals responsive to said test result signals; and

JA000052

5,351,285

23

storing billing provision data for each individual calling terminal based on said call data signals.

**49.** An interface control system for use with, (1) a communication facility including remote terminals for individual callers, wherein said remote terminals may comprise a conventional telephone instrument including voice communication means and digital input means for providing data, and (2) a multiple port, multiple format processor for concurrently processing data from a substantial number of callers in any of a plurality of formats, and (3) a plurality of live operator attended terminals with prompting capability for a plurality of formats, said interface control system comprising:

call data means for receiving signal-represented call data from said remote terminals including DNIS automatically provided by said telephonic communication system;

selection means coupled to said call data means for selecting one format from said plurality of formats of said multiple port, multiple format processor, said selection means being controlled by said signal-represented call data including DNIS to specify imposed conditions that must exist for a connection to said multiple port, multiple format processor, at least one of said formats having at least one imposed condition;

test means coupled to said selection means for testing said specified imposed conditions for said remote terminals to provide approval signals;

interconnect switch means coupled to said test means for providing connections from said multiple port, multiple format processor to said remote terminals under control of said approval signals; and

switch means coupled to said interconnect switch for switching to one of said live operator attended terminals based on call data representative of a remote terminal device.

**50.** A system according to claim 49, further comprising:

switch means for switching calls from said live operator attended terminal back to said multiple format processor for automated processing.

**51.** An interface control system for use with, (1) a telephonic communication facility including remote terminals for individual callers, wherein said remote terminals may comprise a conventional telephone instrument including voice communication means and digital input means for providing data, and (2) a multiple port, multiple format processor for concurrently processing data from a substantial number of callers in any of a plurality of formats, said interface control system comprising:

call data means for receiving signal-represented call data from said remote terminals indicative of DNIS automatically provided by said telephonic communication facility;

selection means coupled to said call data means for selecting one pay to dial format from said plurality of formats of said multiple port, multiple format processor, said selection means being controlled by said signal-represented call data to specify imposed conditions that must exist for a connection to said multiple port, multiple format processor, at least one of said formats having at least one imposed condition;

test means coupled to said selection means for testing said imposed conditions to provide approval signals;

24

interconnect switch means coupled to said test means for providing connections from said multiple port, multiple format processor to said remote terminals under control of said approval signals; and

record means for storing data representative of calls from said individual callers and pay to dial individual caller billing data, under the control of said signal-represented call data.

**52.** A method for interfacing a telephonic communication system according to claim 51, further comprising the step of:

automatically providing calling numbers from said telephone communication system (e.g. ANI) as additional call data signals.

**53.** An interface control system according to claim 51, wherein said individual caller billing data is based on a control word for each operating format which imposes the terms of said caller billing data.

**54.** An interface control system for use with, (1) a telephonic communication facility including remote terminals for individual callers, wherein said remote terminals may comprise a conventional telephone instrument including voice communication means and digital input means for providing data, and (2) a multiple port, multiple format processor for concurrently processing data from a substantial number of callers in any of a plurality of formats, said telephonic communication facility automatically provides call data signals, as to indicate called numbers to select a particular format from said plurality of formats, and (3) a plurality of live operator attended terminals with prompting capability for a plurality of formats, said interface control system comprising:

interface means for providing an introductory automated voice message relating to a specific format from said plurality of formats;

means for forwarding coupled to said interface means for forwarding a call from any one of said remote terminals to one of said plurality of live operator attended terminals;

means for processing coupled to said forwarding means for processing caller information data entered by an operator at said live operator attended terminal;

means for storing coupled to said processing means for storing certain select data from said caller information data entered by said operator; and

means for reconnecting said call to said interface means to receive certain processed data via an automated voice message.

**55.** An interface control system according to claim 54, wherein said call data signals automatically provided by said telephonic communication facility include data representative of said remote terminals.

**56.** An interface control system according to claim 55, wherein said automatically provided call data signals indicating called numbers and data representative of said remote terminals forward said call automatically to one of said plurality of live operator attended terminals.

**57.** An interface control system according to claim 54, wherein certain of said individual callers digitally enter data.

**58.** An interface control system according to claim 57, wherein said data entered by said individual callers is stored in said interface control system.

**59.** An interface control system according to claim 54, further comprising:

5,351,285

25

test structure to specify test conditions against which said caller information data entered by said operators is tested to provide approval signals and said call is interfaced with said specific format depending upon said approval signals.

**60.** An interface control system according to claim 59, wherein said test structure executes a test based on the history of said remote terminal.

**61.** An interface control system according to claim 54, wherein a plurality of called numbers are associated with said select processing format.

**62.** A method for interfacing a telephonic communication system including individual remote calling terminals for individual callers to make individual calls with a multiple port, multiple format data processing system and a plurality of live operator attended terminals, said multiple port, multiple format data processing system for concurrently processing data from said remote terminals according to a plurality of formats, at least one of said formats having at least one condition for said remote terminals calling to interface said data processing system, and wherein said telephonic communication system automatically provides call data signals, said method comprising the steps of:

receiving said call data signals from said telephonic communications system for said remote terminals calling to interface said data processing system indicative of DNIS automatically provided by said telephonic communication system;

selecting for said remote calling terminals, a select processing format from said plurality of formats of said multiple port, multiple format processing system under control of said call data signals, said plurality of formats including pay to dial processing formats;

testing use history conditions for said remote calling terminals when said select processing format is a pay to dial processing format to provide approval signals; and

conditionally interfacing said pay to dial processing format to said remote terminals under control of said approval signals.

**63.** A method for interfacing a telephonic communication system according to claim 62, wherein said automatically provided call data signals further indicate information indicative of said remote terminal devices.

**64.** A method for interfacing a telephonic communication system according to claim 62, wherein said testing step comprises the step of testing use history conditions for said remote calling terminals only for certain state of said pay to dial processing formats.

**65.** An interface control system for use with, (1) a communication facility including remote terminals for individual callers to make calls, wherein said remote terminals may comprise a conventional telephone instrument including voice communication means and some of said remote terminals may further comprise digital input means for providing data, and (2) a multiple port, multiple format processor for concurrently processing data from a substantial number of callers in

26

any of a plurality of formats, said communication facility automatically provides call data signals with respect to pay to dial formats, as to indicate called data (DNIS) including equipment data, to select a particular format from said plurality of formats, and (3) a plurality of live operator attended terminals with prompting capability, for a plurality of formats, said interface control system comprising:

interface means for providing automated voice messages relating to a specific format to certain of said individual callers, wherein said certain of said individual callers digitally enter data through said digital input means;

means for directly forwarding a call coupled to said interface means for forwarding a call from any one of said remote terminals to one of said plurality of live operator attended terminals under control of said call data signals when said remote terminals do not have capability to digitally provide data;

means for processing coupled to said live operator attended terminals for processing caller information data entered by an operator at said live operator attended terminal; and

means for storing coupled to said interface means and said processing means for storing certain select data from said caller information data entered by said operator and data entered digitally by said individual callers.

**66.** An interface control system according to claim 65, wherein one of said pay to dial formats comprises a 900 number calling format.

**67.** A method for interfacing a telephonic communication system including remote terminals with a multiple port, multiple format data processing system, said multiple port, multiple format data processing system for concurrently processing data from said remote terminals according to a plurality of formats, at least one of said formats having at least one condition for said remote terminals calling to interface said data processing system, and wherein said telephonic communication system provides call data signals indicating called (e.g. DNIS) and calling (e.g. ANI) numbers, said method comprising the steps of:

receiving said call data signals from said telephonic communications system for said remote terminals indicative of DNIS and ANI automatically provided by said telephonic communication system;

selecting a pay to dial processing format from said plurality of formats of said multiple port, multiple format processing system under control of certain of said call data signals;

testing said pay to dial processing format in relation to said call data signals to provide test result signals;

conditionally interfacing said pay to dial processing format to said remote terminals responsive to said test result signals; and

storing billing provision data for each individual calling terminal based on said call data signals.

* * * * *

65

JA000054

# PROOF OF SERVICE

   I hereby certify that on March 5, 2013, the foregoing Appellant's Opening Brief was served on the following counsel of record via the Court's Electronic Filing System and electronic mail:

Thomas W. Krause
(thomas.krause@uspto.gov)
Stacy B. Margolies
(stacy.margolies@uspto.gov)
Raymond T. Chen
(ray.chen@uspto.gov)
Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450

/s/Frank V. Pietrantonio
Frank V. Pietrantonio
Attorney for Katz
March 5, 2013

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), as extended in accordance with Katz's pending request to extend the word-count limitation for the opening brief.   The brief contains 8,902 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).   The brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in 14 point Times New Roman Font.   As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count of this word-processing system in preparing this certificate.

/s/Frank V. Pietrantonio
Frank V. Pietrantonio
Attorney for Katz
March 5, 2013